NATIONAL ASSOCIATION OF
RADIATION SURVIVORS,
et al., Plaintiffs,

v.

Edward J. DERWINSKI, Secretary
of Veterans Affairs, et al.,
Defendants.

No. C–83–1861–MHP.

United States District Court,
N.D. California.

Nov. 21, 1991.

James J. Garrett, Gordon P. Erspamer, Michael F. Ram, Morrison & Foerster, Robert H. King, Jr., William C. Morison–Knox, Sonnenchein Carlin Nath & Rosenthal, San Francisco, Cal., for plaintiffs.

George C. Stoll, Asst. U.S. Atty., Civil Div., San Francisco, Cal., Theodore C. Hirt, Gena E. Cadieux, Dept. of Justice, Civil Div., Washington, D.C., Jack Nagan, Office of the Dist. Counsel of The V.A., San Francisco, Cal., Edward J. Luke, Deputy Asst. Gen. Counsel, Veterans Dept., Washington, D.C., Richard A. Hertling, Thomas H. Peebles, Dept. of Justice, Civil Div. Federal Programs Branch, Anne M. Gulyassy, Dept. of Justice, Civil Div., Washington, D.C., for defendants.

Robert L. Gnaizda, Public Advocates, Inc., San Francisco, Cal., for American G.I. Forum, intervenor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PATEL, District Judge.

Plaintiffs have brought this action to challenge the constitutionality of 38 U.S.C. §§ 3404 and 3405, which limit the fee a veteran or veteran's survivor may pay to an attorney to assist him or her in prosecuting a claim before the Veterans Administration ("VA") to $10.00, and which impose criminal penalties on attorneys who accept fees in excess of the $10.00 limit. By order of June 12, 1984, this court granted plaintiffs' motion for a preliminary injunction prohibiting the enforcement of the $10.00 fee limit. *National Ass'n of Radiation Survivors v. Walters,* 589 F.Supp. 1302 (N.D.Cal.1984) [*"NARS I"*]. The Supreme Court reversed, holding that the fee limit was not unconstitutional on its face. *Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) ["NARS II"]. However, the Court's opinion left open the possibility that, on remand, plaintiffs would be able to show that the fee limit was unconstitutional as applied to particular classes of complex claims. *See NARS II,* 473 U.S. at 337–38, 105 S.Ct. at 3197–98 (O'Connor, J., concurring).

On remand, plaintiffs amended their complaint to challenge the constitutionality of the fee limit as applied to claimants with service-connected disability or death

("SCDD") compensation claims based on exposure to ionizing radiation. This court granted plaintiffs' motion for certification of a class consisting of "all past, present and future ionizing radiation claimants who have, or will have, some form of 'active' claim relating to SCDD benefits before the VA." *National Ass'n of Radiation Survivors v. Walters*, 111 F.R.D. 595, 598 (N.D.Cal.1986) ["*NARS III*"]. After extensive pretrial proceedings, the matter was tried to the court over a period of nearly two months. The trial included testimony by numerous expert witnesses regarding the medical, scientific and legal complexities characteristic of ionizing radiation claims.

During and after the trial Congress worked to change the manner in which veterans' claims were adjudicated and reviewed. After adoption of the Veterans' Judicial Review Act of 1988, Pub.L. No. 100–687, 102 Stat. 4113 et seq. (1988), the parties went to great lengths to settle this action in light of the new legislation.[1] Ultimately, the efforts to settle were unsuccessful and the parties returned to this court for a decision on the merits based upon the trial record and other post-trial submissions.

Having considered the evidence presented at trial and the arguments of the parties, and based on the findings of fact and conclusions of law set forth below, the court holds that the $10.00 fee limitation on attorneys' fees imposed by 38 U.S.C. §§ 3404 and 3405 is unconstitutional as applied to SCDD claims for benefits based on exposure to ionizing radiation.

## LEGAL FRAMEWORK

Plaintiffs argue that the $10.00 fee limit, as applied to SCDD claimants whose claims are based on exposure to ionizing radiation and who are not covered by the Veterans' Judicial Review Act of 1988, violates due process and the First Amendment because it deprives claimants of a meaningful opportunity to present their claims to the VA and to petition the government.

A court faced with a procedural due process challenge must initially determine whether the plaintiffs possess a life, liberty or property interest protected by the Constitution. In reversing this court's order granting a preliminary injunction, the Supreme Court found it unnecessary to decide whether applicants for SCDD benefits pos-

---

1. The Veterans' Judicial Review Act of 1988 ("JRA") was signed into law on November 18, 1988. The JRA amended the fee limitation challenged by plaintiffs in this case by providing that a fee may be paid for attorney services rendered after the date of the first date on which the Board of Veterans Appeals renders a final decision in a case and by creating the United States Court of Veterans Appeals to provide judicial review for BVA decisions.

The fee provisions of the JRA, however, apply only to cases in which a Notice of Disagreement was filed with the VA on or after the Act's date of enactment. Thus, the fee limitation challenged in this case still applies to those members of the class who are past or current claimants and filed a Notice of Disagreement prior to November 18, 1988.

The court declined plaintiffs' invitation to rule on the constitutionality of the JRA in this suit and instead encouraged the parties to enter into settlement negotiations which might afford the same protections provided by the JRA to those members of the class not covered by the Act. After negotiations conducted over almost two years, the parties failed to reach an agreement, leaving the court to rule on the constitutionality of the fee limitation as it applies to those members of the class not covered by the JRA.

The court also notes that two other relevant pieces of legislation have been enacted since the trial in this case. The Radiation–Exposed Veterans Compensation Act of 1988, P.L. 100–321, creates a presumption of service connection for thirteen diseases which manifest to a degree of ten percent within specified latency periods. The Radiation Exposure Compensation Act, P.L. 101–426, provides one time payments of $50,000 to individuals who participated onsite in a test involving the atmospheric detonation of a nuclear device, developed a disease specified in the statute, and meet certain other conditions. The lump sum payment will be decreased by the amount of "any payment made pursuant to a final award of settlement on a claim" based on injuries resulting from exposure to radiation. P.L. 101–426, § 6(c)(2). It appears that veterans' benefits received may be included in this offset. 136 Cong.Rec. H12271–72 (daily ed. Oct. 23, 1990) (Conf. Rep. on H.R. 4739).

Having reviewed these public laws, the court has determined that they do not moot the claims of the class as a whole. Thus, the court must rule on the constitutionality of the fee limitation as it applies to those members not covered by the JRA or the other public laws described above.

sessed a protected property interest in those benefits. *NARS II,* 473 U.S. at 320 n. 8, 105 S.Ct. at 3189 n. 8. This court sees no reason to disturb its earlier determination that both recipients of and applicants for SCDD benefits possess a property interest protected by the Constitution. *See NARS I,* 589 F.Supp. at 1313–14. Indeed, the Ninth Circuit's decision in *Gonzalez v. Sullivan,* 914 F.2d 1197, 1203 (9th Cir. 1990), in which the court ruled that an applicant for social security disability benefits has a property interest in those benefits, buttresses this court's earlier ruling.

Once a court has concluded that the plaintiffs possess a protected interest, the court must examine the procedures provided for the protection of that interest to determine whether they meet the requirements of a due process challenge. *See NARS II,* 473 U.S. at 320, 105 S.Ct. at 3188. Determining what process is due requires consideration of the three factors set forth in *Mathews v. Eldridge:*

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *see NARS II,* 473 U.S. at 321, 105 S.Ct. at 3189.

A deprivation of a liberty or property interest is not required as a premise for a First Amendment claim. *Perry v. Sinderman,* 408 U.S. 593, 596–98, 92 S.Ct. 2694, 2696–97, 33 L.Ed.2d 570 (1972). Moreover, "[t]he right of access to the courts is subsumed under the first amendment right to petition the government for redress of grievances." *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1314 (9th Cir.1989). The Supreme Court has held that the First Amendment protects efforts by organizations and individuals to obtain legal representation for themselves or their constitu-

ents. The First Amendment protects union members' efforts to advise workers to obtain legal advice and to recommend specific lawyers, *Brotherhood of Railroad Trainmen v. Virginia ex rel. Va. State Bar,* 377 U.S. 1, 8–9, 84 S.Ct. 1113, 1117–18, 12 L.Ed.2d 89, *reh'g denied,* 377 U.S. 960, 84 S.Ct. 1625, 12 L.Ed.2d 505 (1964); the employment of counsel by unions to represent their members, *United Mine Workers of America Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 221–22, 88 S.Ct. 353, 355–56, 19 L.Ed.2d 426 (1967), *United Transportation Union v. State Bar of Michigan,* 401 U.S. 576, 580–85, 91 S.Ct. 1076, 1079–82, 28 L.Ed.2d 339 (1971); and the efforts of non-profit organizations to provide legal representation for persons seeking to vindicate their civil rights. *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

## FINDINGS OF FACT

I. *Evidence Relevant To The Private Interest Affected*

Ionizing radiation ("IR") claimants are either veterans or their survivors (usually widows). Ex. 461. The record before the court indicates that IR claimants are generally poor, and in the cases of veterans themselves, almost always in poor health. RT at 1185–86. The Legal Services Corporation estimates that more than ten percent of all poor people in the United States are veterans or their dependents. Ex. 70 at 55. Evidence introduced by plaintiffs indicates that eleven percent of IR claimants have annual family incomes below $5000, forty-three percent have annual family incomes below $10,000, and sixty-eight percent have annual family incomes below $20,000. Ex. 460 at 5. In addition, seventeen percent of IR claimants have annual family medical expenses over $20,000, twenty-nine percent have medical expenses in excess of $10,000, and forty-five percent have medical expenses in excess of $5000. *Id.*

In light of this evidence, the court finds that a substantial majority of IR claimants would rely primarily on SCDD benefits for their basic maintenance and support.

## II. *Evidence Relevant To The Risk Of Erroneous Deprivation*

### A. Complexity of Governing Law and Procedures

IR claims, like other SCDD claims, are adjudicated within the framework of existing Veterans Administration ("VA") rules and regulations. In addition, a series of special VA rules and regulations have been promulgated specifically to address IR claims.

Veterans' law encompasses an extensive body of statutes, regulations, and other materials. RT at 23:2–27:4, 28:5–35:1, 38:8–40:4, 40:10–41:20, 50:17. The principal applicable statute is 38 U.S.C. §§ 1–5000. SCDD claims are also governed by regulations codified in the Code of Federal Regulations; a body of VA General Counsel opinions and Board of Veterans' Appeals ("BVA") decisions; VA circulars; and adjudication and program manuals. RT at 23–27. These materials interface with each other and form a complex web of governing authority. RT at 71.

The competent use of these materials is a laborious task. For example, it is necessary to monitor the Federal Register for changes in governing regulations. RT at 27. General Counsel opinions are not digested, making them difficult to research and access. RT at 32. There are numerous relevant agency manuals, including the VA Adjudication Manual (M21–1), Ex. 456, which addresses agency adjudication procedures; the VA Program Guide (PG21–1), Ex. 459; the MBVA Manual, Ex. 457, which covers areas over which the BVA has jurisdiction; and the Field Appellate Procedure Manual (M21–4), Ex. 458, which regulates the conduct of hearings in the VA's regional offices. RT at 38–40, 44. The manuals are lengthy and it is often difficult to gain access to them.[2]

Under the federal regulations governing SCDD claims, an IR claimant must "submit evidence sufficient to justify a belief in a fair and impartial mind that the claim is well grounded." 38 CFR § 3.102. The claimant must demonstrate not only that the disability exists or that the death occurred, but also that the disability or death is "service-related." 38 U.S.C. § 301 *et seq.*

In addition to these general regulations, in 1985 the VA adopted a special set of regulations for IR claims in response to the mandate of P.L. 98–542. These regulations are codified in 38 CFR § 3.311b. Section 3.311b sets forth three prerequisites that must be met in order for an IR claim to be referred to the Chief Benefits Director for further consideration: (1) that the veteran was exposed to ionizing radiation as a result of participation in the atmospheric testing of nuclear weapons, occupation of Hiroshima or Nagasaki, Japan from September 1945 until July 1946, or other activities as claimed; (2) that the veteran subsequently developed one of seventeen diseases enumerated in the regulation; and (3) that the disease first became manifest within periods specified in the regulation.[3] Where the threshold criteria are not met, a claimant may still attempt to prove his or her claim by invoking section 3.304, the general VA regulation concerning direct service connection, or section 3.309, the general VA regulation which creates presumptive service connection for certain diseases manifesting to a designated degree within a specified period after separation from service. RT at 146:23–147:3.

The record indicates that the claim development process for IR claims is far more detailed and complex than that for other SCDD claims. If the VA regional office to which an IR claim is submitted determines that the claim meets the three threshold requirements of section 3.311b, the claim is then subjected to a review process. The regional office sends the claimant a "pattern" letter requesting detailed information regarding his or her claim. The pattern

---

2. For example, the M21–1 Manual consists of fifty five chapters. *See* Ex. 456.

3. Bone cancer must manifest within thirty years after exposure; posterior subcapsular cataracts must manifest six months or more after exposure; leukemia may manifest at any point after exposure; and other diseases must manifest five or more years after exposure. 38 CFR § 3.311b(b)(4)(i)-(iv).

letter sent to IR claimants has more questions and requests more complicated information than the pattern letter sent in other SCDD claims. RT at 74, Ex. 456 at 22–6, Ex. 751. If the claimant does not respond to the pattern letter within sixty days the claim may be administratively disallowed for failure to prosecute. RT at 190, Ex. 465, 970.

The regional office then refers the claim to the Defense Nuclear Agency ("DNA") of the Department of Defense to obtain an estimate of the radiation dose level to which the claimant was exposed. 38 CFR § 3.311b(a)(2)(i)–(ii). The general procedures followed by the DNA, including dose reconstruction methodology and dose estimate reporting standards, are codified in 32 CFR § 218.1 *et seq.* If the claimant obtains an independent dose estimate from a "credible source" and that estimate is at least double the estimate provided by the DNA, the regional office will refer the case to an independent expert for a dose reconciliation. 38 CFR § 3.311b(a)(3).

Upon completion of the dose estimate by the DNA, the completed file is then submitted to the Administrative Review Staff ("ARS") of the Compensation and Pension Service ("CPS"). *See* Ex. 305, M21–1, Section 22.05.1(a)(3). In general, non-IR claims are not submitted to the CPS. The ARS reviews the claim and the CPS furnishes a recommendation for either denial or allowance of the claim to the regional office. Ex. 305, M21–1, Section 22.05(e)(3). The rating board of the regional office must consider the CPS recommendation prior to making a final decision on the claim. Ex. 305, M21–1, Section 22.05.2(e)(4).

Once the rating board of the regional office has made a determination regarding the claim, it issues a Notice of Decision ("ND") to the claimant. 38 CFR § 3.103. The rating decision is based on a complicated schedule containing detailed anatomical data and other criteria. 38 CFR § 4.1 *et seq.* If the claim is denied, the claimant may file a Notice of Disagreement ("NOD") within one year of the mailing of the ND; if no NOD is timely filed, the ND is deemed final. 38 CFR § 19.129(a). If an NOD is timely filed, the regional office will reconsider its decision. If the denial is affirmed, the regional office issues a Statement of the Case ("SOC"), stating the basis for the denial. 38 CFR § 19.120.

The claimant has sixty days from the issuance of the SOC or the remainder of one year from the mailing of the ND to file an appeal. 38 CFR § 19.129(b). The appellant is presumed to be in agreement with any statement of fact in the SOC to which no exception is taken. Therefore, the claimant's appeal must set out specific factual or legal grounds for the appeal. 38 CFR § 19.123(a).

The claimant's appeal is reviewed by the BVA. If the BVA denies the appeal, the claimant may move to reconsider when there has been an obvious legal or factual error or when new evidence is discovered. 38 CFR § 19.104. The claimant may also reopen the claim at the regional office level with new and material evidence.

The claimant is entitled to a hearing, upon request, "at any time on any issue involved in a claim...." 38 CFR § 3.103(c). The claimant is also allowed at all stages to introduce documentary, testimonial or other evidence. 38 CFR § 3.103(d).

B. Complexity of Medical Issues

The evidence before the court shows that the medical issues present in IR claims are far more complex than those in other SCDD claims and that the average claimant is not capable of understanding the medical intricacies of an IR claim.

The record reflects that there is a wide array of conflicting expert opinion in an extensive body of medical literature concerning the relationship between cancer and ionizing radiation. The evidence in this case shows disagreement about the following issues: (1) the degree of risk associated with exposure to low levels of ionizing radiation; (2) the latency periods between radiation exposure and the manifestation of certain cancers; (3) the shape of the dose-response curve for exposure to low levels of ionizing radiation; (4) the susceptibility of certain organs and tissue to cancer in-

duction through exposure to ionizing radiation; (5) the manner in which different carcinogenic agents interact and function synergistically; (6) the validity of, and how to interpret, existing epidemiological data on the health effects of exposure to ionizing radiation; (7) the validity of reports produced by groups such as the BEIR III Committee and the United Nations Special Commission On The Effects Of Atomic Radiation ("UNSCEAR"), which the DNA and VA rely on as authoritative sources of data regarding radiation exposure;[4] and (8) the validity of radioepidemiological tables relied on by the VA. RT at 621, 622, 626:2–628:3, 660–62, 1573, 3972–73, 683, 3966–87, 1578:8–25, 4768:8–4794:19, 611–12, 659:14–660:12, 675:1–7, 1574:18–1578:7, 4824:22–4826:5. *See* Exs. 1163, 1164, 1166, 1193, 1228, 1283, 1290, 1330, 1332, A–6092.

While the court need not address each of these issues, several key areas of complexity are examined below to illustrate the complicated nature of the medical issues involved in IR claims.

### 1. Complexity of Causation Issues

Because cancers are synergistic, the evaluation of different risk factors is an inherently complicated endeavor. RT at 602–03, 3256:25–3257:24, 4738:11–4739:10. The examination of a malignancy, for example, will not reveal the cause of the cancer in question. RT at 604. Thus, determining whether exposure to ionizing radiation contributed to the causation of cancer is extremely complex. The record reflects that making such a determination

requires consideration of numerous factors, including the circumstances of exposure; the amount and rate of radiation exposure; the type of radiation received (gamma, beta, alpha, neutron, low LET and high LET[5]); the pathways of radiation exposure; the duration of exposure; the age at manifestation of the disease; the nature of the veteran's disease; the effects of other risk factors and of exposure to other carcinogenic agents; the medical history of the veteran; the latency period between exposure and disease manifestation; the veteran's health at the time of exposure; the veteran's gender; and whether the veteran manifested acute symptoms of radiation exposure just after exposure. RT at 631:5–637:8, 1526:6–1528:14, 2308:13–2310:11, 2317:12–2318:22, 2319:25–2326:22.

Experts disagree on numerous issues with regard to cancer causation. RT at 605–06. For example, the record reflects disagreement among the expert witnesses of plaintiffs and defendant as to whether all cancers may be caused by radiation and whether certain organs may be excluded from the list of radiation-induced cancers. RT at 621, 4000–02.

### 2. Complexity of Disease Classification And Manifestation Issues

The evidence before the court indicates that determining whether a claimant's condition is covered by one of the diseases listed in the ionizing radiation regulations can present complex issues of disease classification.[6] RT at 1486:10–1494:13, 1503:1–

---

**4.** Under the auspices of the National Academy of Sciences and the Environmental Protection Agency, a committee of the National Research Council was established to investigate and report on the health consequences of radiation exposures. The Committee known as the BEIR (Biological Effects of Ionizing Radiations), has produced a number of reports. The court has been asked to take judicial notice of several of these, including the last report, BEIR V. Much of the early and ongoing work of the BEIR Committee has been testified to by experts for plaintiffs and defendant. Accordingly, this court has taken judicial notice of BEIR V and considered the discourses contained in the BEIR reports entered into evidence or judicially noticed in this case.

**5.** High LET radiation is radiation with dense ionization which produces a greater biological

effect at lower physical doses of radiation. Low LET radiation, in contrast, has few ionizations. X rays and gamma rays are examples of low LET radiation, while alpha particles are a form of high LET radiation.

**6.** Section 3.311b(b)(2) defines radiogenic diseases to include the following: (1) all forms of leukemia except chronic lymphatic leukemia, (2) thyroid cancer, (3) breast cancer, (4) lung cancer, (5) bone cancer, (6) liver cancer, (7) skin cancer, (8) esophageal cancer, (9) stomach cancer, (10) colon cancer, (11) pancreatic cancer, (12) kidney cancer, (13) urinary bladder cancer, (14) salivary gland cancer, (15) multiple myeloma, (16) posterior subcapsular cataracts, and (17) non-malignant thyroid nodular disease.

1515:15. Statistics introduced into evidence by the plaintiffs indicate that forty-nine percent of IR claimants who claim disability due to radiation exposure suffer from diseases not included in § 3.311(b)(2). Ex. 460.

Assessing the period of time from exposure to manifestation of a disease is also a difficult task. RT at 683. One complication is caused by the fact that the IR regulations do not specify what is meant by manifestation; thus, manifestation may be defined as the date of cell damage, the date of pre-diagnosis manifestations, the date of onset of symptoms, or the date of diagnosis. RT at 1494:14–1502:3. Determining the date of cell damage, pre-diagnosis manifestations and the date of the onset of symptoms may require numerous tests and an exacting assessment of an array of medical factors. RT at 1494:14–1502:3. There is evidence in the record of claim denials based on erroneous interpretations of the regulatory manifestation periods by the VA. RT at 88, Ex. 922.

### 3. Validity Of Radioepidemiological Tables

Radioepidemiological tables have been developed by the National Institute of Health (NIH) to provide estimates of the probability of causation for various radiogenic diseases based on differing levels of exposure to radiation. The tables are relied on by the VA in assessing IR claims.

The evidence before the court demonstrates that experts disagree as to the validity of the tables. Plaintiffs' expert witnesses testified that use of the tables was inappropriate in deciding individual IR claims. Among the criticisms of the tables are that (1) they underestimate the risks of exposure to ionizing radiation, RT at 675:1–7; (2) they fail to take account of consequences of exposure to high LET radiation, RT at 673:22–674:2, 3267:7–14; (3) they fail to take into account factors important in evaluating causation, RT at 1543:20–24; (4) they fail to take into account regional variations in cancer incidence, RT at 672:17–673:21; and (5) they are subject to a high degree of uncertainty. RT at 1546:8–1548:15, 3260:22–3262:8, 4799:12–4802:13.

In light of the complexity of the medical issues involved, disagreement in the medical field with regard to cancer causation issues and the health effects of low level exposure to ionizing radiation, the difficulty of disease classification and of discerning disease manifestation periods, and conflicting evidence regarding the validity of radioepidemiological tables employed by the VA and of other epidemiological data available in the field, the court finds that proper presentation and adjudication of IR claims will often require the marshalling of expert medical opinion and testimony.

### C. Complexity of Scientific Issues

The evidence reflects that the scientific issues involved in IR claims are extremely complex and are beyond the capacity of a lay-claimant to understand.

#### 1. In General

Four types of radiation were produced by the nuclear explosions at issue in this case—gamma rays, alpha particles, beta particles, and neutron radiation. Each has distinct properties and distinct health repercussions. RT at 468. There were also different pathways of exposure. A pathway identifies the source of radiation and the route by which the radiation exposes the individual. The three principal pathways of exposure are external, internal and absorption. RT at 472:16–473:6.

Gamma rays and neutrons are the primary sources of external exposure, or exposure to the body surface. There can also be some external exposure from beta particles, but the low penetrating power of these particles means they generally expose only superficial parts of the body. RT at 473.

Sources of internal exposure via ingestion and inhalation include all sources of external exposure and alpha particles. RT at 474. The radiation dose attributable to internal exposure through inhalation depends on numerous factors, including the properties of the radionuclides inhaled, respiration rate, the characteristics of the tissues involved, and metabolism and excretion rates. RT at 474:9–475:17, 507:5–

510:2, 1968:5–23. Ingestion encompasses activities such as eating and drinking contaminated food and liquid and other activities like cigarette smoking.

The third pathway is absorption, which encompasses exposure through an open wound or penetration of the intact skin by radionuclides. The degree of exposure through absorption depends on numerous factors, including the nature of the wound, the concentration of the radioactive material and the properties of the radionuclides involved. RT at 475:23–476:3, 510:3–511:21.

### 2. *Radiation Dose Estimates*

The record indicates that one of the most important steps in adjudication of an IR claim is estimating the dose of radiation to which the veteran was exposed. Based on the evidence introduced at trial, the court finds that estimating radiation doses is a complicated endeavor involving a multitude of factors. Among the tasks which must be undertaken in estimating the dose of radiation to which a veteran was exposed are: (1) analysis of test factors, including weapon type and yield, the veteran's location in relation to the test, weather patterns, and the type of shielding or protective gear utilized; (2) evaluation of the mode of exposure; (3) collection and interpretation of available data from test sites, including data from film badges, geiger counters and other measuring instruments; and (4) evaluation of DNA dose estimates, including analysis of models and reports used in preparation of the estimates. RT at 1931:13–1940:1.

The Defense Nuclear Agency ("DNA") furnishes radiation dose estimates to VA regional offices in connection with IR claims. When the claimant wore a film badge[7] at the time of exposure, the DNA relies on the film badge reading to determine the dose estimate. Where a substantial percentage of the unit was badged, the DNA uses dose assignment methodology to assign a dose estimate to unbadged members. Where sufficient film badge data is not available, the DNA develops generic dose reconstructions based on data collected regarding a particular test site and assigns the dose estimate produced in this way to the individual claimant. RT at 3666–67.

The record indicates much disagreement regarding the validity of the dose estimates provided by the DNA. For example, there is disagreement among scientific experts with regard to the reliability of film badge data. Many test participants and occupation troops were not badged; some were badged for only a portion of their periods of exposure. RT at 531:8–534:73, 3705–06. In addition, the validity of film badge data has been questioned because the badges are directionally dependent, i.e. they more accurately measure exposure in the direction they face than exposure at other points. In addition, the badges do not measure internal exposure and do not accurately measure beta radiation exposure. RT at 516:24–521:11, 1943:19–1946:10. Moreover, the limit of some film badges used by the U.S. military to measure radiation exposure at nuclear testing sites was two rems,[8] meaning the badges were unable to record exposure at higher levels. RT at 530:17–25. Finally, plaintiffs' experts testified that the inaccuracy of film badges is exacerbated under field conditions. RT at 516:10–518:14, 529:16–530:16, 1437:5–24.

In developing dose estimates for IR claimants in the absence of film badge data, the DNA has relied primarily on generic dose reconstructions, which reconstruct the dose to which the DNA believes members of a group participating in a particular nuclear test have been exposed. Procedures for development of dose reconstructions by the DNA are codified in 32 CFR, Part 18. Generic dose reconstructions do not take into account particularized information concerning the activities of the individual at the test site.

---

**7.** A film badge is a small piece of film encased in a metal or plastic container which can be attached to clothing. Film badges are common means by which individual radiation exposure is measured.

**8.** A rem is a unit of dose expressing the biological effectiveness of radiation.

The evidence demonstrates that the type of generic dose reconstruction engaged in by the DNA is extremely complex and the subject of much controversy. The DNA dose reconstructions rely, *inter alia,* on data regarding radiologic conditions obtained by analysis of data on contamination levels, soil samples, and water samples, as well as health studies, mortality studies and oral interviews. RT at 3670–3676.

Trial testimony suggests that numerous other factors should also be considered in order to develop an accurate dose reconstruction. These factors include the nature of the weapons test, the rate of radioactive decay and distribution, and the effect of environmental forces like rain and wind. Factors personal to the claimant should also be weighed. These factors include the location of the veteran in relation to ground zero, activities undertaken by the veteran, when the veteran entered the radioactive area, and the protective gear the veteran utilized. RT at 472:16–480:7, 482:24–488:25, 507:5–511:2, 1931:13–1940:2, 3727:3–3731:8, 630–32.

The evidence further indicates that the ability to prepare accurate dose reconstructions is limited by numerous factors, including the passage of time and deficiencies in the monitoring devices used at test sites. RT at 512:13–513:7, 514:17–523:10, 534:8–553:12, 1450:15–1455:5, 1457:7–1458:5, 528:16–536:12, 1967:10–1968:15.

The record reflects considerable disagreement among experts regarding the accuracy of generic dose reconstructions produced by the DNA. In addition to the failure to consider the factors identified above, plaintiffs' expert witnesses offered numerous other criticisms of the DNA reconstructions. For example, the assumptions employed in the DNA models are alleged to frequently be inaccurate and not properly documented. RT at 536–38, 562–64, 572:25–574:16, 584:4–585:14, 1355–57, 1948–49, 2049–65. In one case, plaintiffs' expert witness testified that the DNA model for Operation Crossroads made inaccurate assumptions concerning both the relevant radiation field and the behavior of the combat teams in the test area. These in-

correct assumptions allegedly led to an underestimation of exposure. RT at 2005–2040. The generic dose reconstruction for Shot Simon also appears to have been based on inaccurate assumptions regarding troop movements. RT at 2018–22, 3753–54, 2035:5–8, 2029:7–20, 2028:23–2030:4.

In addition, there is trial testimony that the models for some tests fail to consider material pathways of radiation exposure. RT at 564:10–566:16, 1432–34, 2049–65, 1986–87. For example, plaintiffs' expert testified that the model for Operation Crossroads failed to consider contaminated air, soil and lagoon water, among other factors, as possible sources or pathways of radiation exposure. RT at 564–71. Two General Accounting Office reports introduced into evidence raise additional questions regarding the validity of the dose reconstruction model for Operation Crossroads. Ex. 555, 1342.

Certain DNA dose reconstruction models are alleged to improperly evaluate internal exposure. RT at 1970–76. For example, the Shot Simon dose reconstructions failed to consider ingestion, while the evidence shows that the ground troops were issued bag lunches to take with them to the test site. RT at 1998:18–1999:7. There is also evidence that some DNA models utilize faulty uncertainty analysis, thus disguising the degree of uncertainty in the models and overestimating the accuracy of the calculation produced. RT at 576–78, 1955:15–1962:6, 2039:3–22.

In light of the evidence in the record and the numerous factors relevant to dose estimates cited above, the court finds that individualized dose reconstructions, tailored to the particularities of the individual claim, are more accurate predictors of the radiation exposure of an individual than generic dose reconstructions. RT at 488–90, 506:12–507:4, 591–92. The court also finds that particularized information concerning a veteran's activities at a nuclear testing site can be extremely useful in obtaining an accurate individual dose reconstruction. RT at 505:25–507:4.

The court further finds, based on the evidence demonstrating the complexity of

radiation dose reconstruction and the disagreements in the field concerning the validity of film badge data and the development and application of dose reconstruction methodology, that adequate presentation and adjudication of IR claims will generally require marshalling expert scientific and medical evidence in complex and disputed areas of the fields implicated.

### D. Complexity of Factual Development

Given the tremendous diversity and complexity of the medical and scientific issues involved in IR claims, it is not surprising that properly developing the facts underlying these claims is an extremely intricate undertaking. A plethora of information is useful in establishing pathways to which a veteran might have been exposed at the time of the nuclear explosion and other factors which may have contributed to the claimant's health problems. Such information is essential to proving the level of radiation exposure, completing an individual dose reconstruction and demonstrating causation.

Among the information which can be vital to an IR claim is where the veteran was located at the time of the explosion. In the case of veterans stationed on ships, where the ship was berthed and where on the ship the veteran was bunked are both extremely relevant. RT at 164–65. Activities undertaken by the veteran, such as decontamination of a ship or participation in a landing party disembarking on a contaminated island, are pertinent. What type of bomb was exploded, when the veteran entered the radioactive area and how long he remained there, what type of protective shielding was available and if and when the veteran used it are all germane to an IR claim and therefore should be a part of complete factual development. RT at 630–32.

The fact development process is greatly complicated by the fact that much of the necessary information is not easily obtained. For example, numerous documents must be collected and provided to a health physicist if an independent and individualized dose reconstruction is to be completed.

These documents include technical reports concerning the test, internal dose assessments, and documents showing the whereabouts and activities of the veteran. RT at 1113–14. Many important documents, such as ship blueprints and other materials important to identification of pathways of exposure must be obtained from the appropriate government agencies by making a request pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Some documents may be classified, thus requiring declassification through the Secrecy Act, 50 U.S.C. § 401 et seq. In addition, it often is extremely useful to discover the identity of other veterans who participated in a particular test along with the claimant in order to obtain information regarding the claim. This information is difficult to acquire and often must be obtained through the Privacy Act, 5 U.S.C. § 552a.

### III. *Evidence Relevant To Existing Safeguards*

There are several facets of the VA claim adjudication system which are designed to safeguard the procedural rights of SCDD and IR claimants. The court now turns to an examination of the evidence with regard to these supposed safeguards.

### A. Presumptions in Favor of the Claimant

Section 3.309 creates a presumption of service connection for enumerated diseases which manifest in a compensable degree within applicable time limits. 38 CFR 3.309. Therefore, claimants who can demonstrate that they have been afflicted by a specified disease within the appropriate manifestation period need do nothing more to prove service connection.

While section 3.309 creates a presumption in favor of the claimant, evidence presented at trial demonstrates the illusory nature of this safeguard. First, manifestation periods are often difficult to determine, and as the evidence before the court concerning the complexity of medical issues demonstrates, it will frequently be a complicated task for a claimant to prove

precisely when a disease first manifested itself. RT at 1494:14–1502:3.

Second, the presumptive periods created by section 3.309 have been misapplied by the VA to the detriment of claimants, leading to the erroneous denial of claims. RT at 89, 146, Ex. 922. Ex. 454 [NAM004 0441]. For example, the VA denied plaintiff Reason Warehime's IR claim for lung cancer because the cancer did not manifest within one year of exposure. Ex. 454 [NAM004 0441]. However, while sections 3.307 and 3.309 create a presumption of service connection for malignant tumors which manifest themselves within one year from the termination of military service, nowhere do these regulations create a presumption that a malignant tumor is not service-connected if it does not manifest within one year.

Third, the threshold requirements of section 3.311b can function to offset the protections of the presumptive periods in that the VA may deny claims which fail to meet one of the three threshold requirements even when the claimant might be eligible for benefits under section 3.309. RT at 145–47.

The court finds that section 3.309 does not effectively safeguard the rights of IR claimants or contribute in any significant way to the proper adjudication of IR claims.

When "a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant." 38 CFR § 3.102. The evidence indicates that in IR claims the "reasonable doubt" provision does not provide a significant safeguard to the claimant. RT at 148–50. Section 3.102 defines reasonable doubt as "an approximate balance of positive and negative evidence which does not satisfactorily prove or disprove the claim." The sharp disagreements among experts concerning many of the medical and scientific factors central to determining the validity of an IR claim makes application of the reasonable doubt standard exceedingly difficult. The synergistic nature of cancers makes application of the standard even more problematic, especially in light of the provision in section 3.311b(g) that service connection will not be established "if there is affirmative evidence to establish that a supervening, nonservice-related condition or event is more likely the cause of the disease." RT at 149, 434–35.

There is absolutely no evidence in the record to suggest that the reasonable doubt standard codified in section 3.102 has been employed by the VA in IR claims in a manner beneficial to claimants.

**B. Informal and Non–Adversarial Nature of the VA Adjudication System**

No evidence was presented at trial which supports the notion that the supposedly informal and non-adversarial nature of the VA adjudication system for IR claims serves as a safeguard for claimants.[9]

The record indicates that the factual development of IR claims conducted by VA regional offices is extremely limited. An abstract of a random selection of 674 IR claims files prepared by plaintiffs indicates that no dose estimate was obtained by the VA regional office in fifty-nine percent of IR cases and that no physical exam was conducted in forty-eight percent of the claims. Ex. 461. Trial testimony suggests that those medical exams which do occur are of questionable quality. RT at 93:15–94:5. Indeed, in 509 cases the VA appears to have done no independent factual development. The lack of factual development appears to be due to the complicated nature of IR claims and to the fact that the VA's "work product" schedule does not provide additional work credits for IR claims, even though if adjudicated properly these claims clearly would be far more time-consuming than other SCDD claims. Ex. 458. Thus, there is an institutionalized incentive to underprepare the IR claims.

The evidence shows that in the vast majority of IR claims the VA does little in the way of fact development other than to col-

---

**9.** The court notes that characterizing the byzantine procedures described in this order as "in-formal" appears to strain the meaning of the term.

lect the claimant's service and medical records and send the claimant a pattern letter. For example, the VA does not contact and interview other members of the claimant's former unit and does not seek the medical and military records of those members in order to detect patterns of exposure or disease among those individuals. RT at 3115:20–3117:22.

In light of the complex medical and scientific issues involved, the difficulty of obtaining appropriate records, and the limited ability of a lay-claimant or service representative to comprehend the relevant issues, pattern letters alone are not a sufficient or effective means of fact development. RT at 75, 96–98, 2332–33, 2344–47, 2349–50. Moreover, the use of complicated pattern letters acts to the claimants detriment in that if the claimant fails to respond to the pattern letter within sixty days, the claim may be administratively disallowed for failure to prosecute. RT at 168–69, Ex. 456, M21–1 Manual, §§ 7.01, 16.03.

Referral of IR claims to the Compensation and Pension Service ("CPS") for review and a recommendation provides little additional protection. Claimants are not given a hearing before the advisory review staff of the CPS. RT at 78:9–79:5. In addition, trial testimony indicates that the CPS staff have little training or expertise in radiation exposure. RT at 98–99. The importance of the lack of expertise of the CPS staff is magnified by the fact that at the time of trial, no IR claim had been identified where the rating board of the regional office had failed to follow a recommendation made by the CPS. Jt. Pretr. Conf. Stat. at 22.

The evidence before the court does not bear out the government's contention that the VA adjudication system for IR claims functions in a non-adversarial manner so as to safeguard the claimant's interests. Instead, the court finds the testimony of Keith Snyder, attorney for the Vietnam Veterans of America and the National Veterans Legal Services, to be credible and persuasive on this matter. Mr. Snyder testified that the VA's adjudication of IR claims is more accurately characterized as adversarial. RT at 257–59. The evidence supports Mr. Snyder's contention.

The record is replete with examples of the VA's lack of solicitude for IR claims and agency behavior that demonstrates a disregard for the procedural and substantive rights of IR claimants. *See, e.g.*, RT at 1086–94. For example, there is evidence that the VA actively discourages IR claimants from invoking their right to a hearing where they could more fully present their claims, provide expert medical and scientific testimony and respond to rating board concerns. Ex. 18 at 11, 17 at 137–39, 1042. Personal hearings are held in only 5.69% of IR claims. In less than one percent of the cases are those hearings held prior to the VA's initial determination. RT at 250. IR claimants are discouraged from requesting hearings despite the fact that the evidence shows that those claimants who have hearings have a substantially higher success rate than those who do not. RT at 248–50.

The record indicates that, either by design or neglect, the VA has operated in such a manner so as to frequently put the claimant at a disadvantage in the adjudication process. Materials important to development of an IR claim often are not made available at VA regional offices. RT at 258. The vast array of materials, General Counsel opinions, and other documentation relevant to IR claims are not indexed so as to make them accessible to a lay-claimant. *Id.* And pattern letters sent to the IR claimant solicit information adverse to the claim without requesting information tending to prove it. RT at 259–60.

One example of the adversarial functioning of the VA adjudication of IR claims is the case of plaintiff Reason Warehime. At the time of trial, Warehime had been waiting eight years for resolution of his various IR claims. Ex. 454 [NAM003 0628–0632, NAM003 1000]. His claims had been remanded by the BVA to the VA's Northern California regional office on five separate occasions. The record of the adjudication of Warehime's IR claims contains an almost interminable string of lengthy delays, poor fact development and other forms of agency inaction and neglect which are both

unjustified and clearly not in the claimant's interest. *See* Ex. 454.

In light of the above evidence, the court finds that the supposed informal and non-adversarial nature of the VA adjudication process for IR claims does not provide a significant safeguard for IR claimants.

### C. Availability of Service Representatives

Volunteer service representatives are made available to IR claimants through various veterans organizations. In an ordinary case of impact injury or in other cases of a routine nature these representatives appear to do an adequate job. However, as explained below, these service representatives are unable to do a competent job for IR claimants or to provide adequate safeguards for them.

While service representatives undoubtedly are well-intentioned, their "crushing" caseloads make effective representation of claimants with complicated IR claims virtually impossible. Ex. 70. For example, the Disabled American Veterans employed ten appeals-level service representatives who handled 17,954 claims in Fiscal Year 1986; the two representatives of the AmVets presented 1304 claims to the BVA the same year. RT at 1780–82, Ex. 263.

Training of service representatives is very limited, and they receive no specialized training in the intricacies of IR claims. RT at 1174–75, 1177. As a result, service representatives often do not detect errors in VA denials of IR claims. RT at 1178–83.

In addition, the evidence shows that service representatives do little in the way of fact development for IR claims, instead relying almost exclusively on the claimant to marshal the complicated array of materials and information necessary to successfully present a claim. RT at 1107:23–1108:5, 1704:22–1707:2, 1712. For example, service representatives rarely obtain independent medical exams for claimants. RT at 1706. Worse yet, it appears that in most cases service representatives do not meet with the claimant before a rating decision is made. RT at 1708.

Service representatives rarely request a hearing for the claimant before the rating board and often discourage veterans from requesting a hearing prior to denial of the claim by the regional office. RT at 1150, 1730, Ex. 236. The record suggests that in those instances where a service representative does obtain a hearing for the claimant and represents the claimant, the representative often does not perform effectively as an advocate. RT at 1149–50, 1160–65, 1736. Frequently, the representative meets with the claimant for the first time one hour prior to the hearing. RT at 1149.

The evidence also indicates that service representatives are not an effective safeguard in appeals of claim denials before the BVA. Service representatives frequently fail to notify claimants of their right to appeal, and as a result, claimants often fail to exhaust their administrative remedies. RT at 1714. Where the claimant is advised of his or her right to appeal, in most cases the claimant fills out the substantive appeal form without the assistance of the service representative. RT at 1159–60, 1724. This occurs despite the fact that the claimant is deemed to accept any factual finding in the Statement of the Case not disputed in the substantive appeal form. Service representatives rarely request hearings on behalf of the IR claimant before the BVA. RT at 1733. Appeals briefs prepared by service representatives are often inadequate. RT at 1158.

In sum, the evidence strongly suggests that there is little difference in quality between claims prepared solely by the IR claimant and those prepared with the assistance of a service representative. RT at 1169. The deleterious effects of the service representatives' almost total reliance on the claimant is magnified by the fact that the average veteran claimant has only an eleventh grade education. Ex. 461. Thus, service representatives do not provide any significant safeguard to the IR claimant.

### IV. *Evidence Relevant to the Probable Value of Attorneys in Reducing the Risk of Erroneous Deprivation*

The record indicates that preparation of ionizing radiation claims involves a wide

variety of tasks for which attorneys are trained and particularly well-suited. Attorneys frequently are trained and experienced in the use of FOIA, the Secrecy Act and the Privacy Act to obtain government documents. The record indicates that attorneys are very effective at obtaining records necessary to document an IR claim from the numerous government agencies involved. RT at 241:5–244:5. Such skills are essential for successful presentation of IR claims, given the frequent need to rely on government documents to, for example, analyze and critique DNA generic dose reconstructions.

Attorneys are frequently experienced in claim development and would be invaluable in insuring that claimants supply information requested by the VA in a timely manner, thus avoiding such possibilities as administrative denial for failure to respond adequately to a pattern letter. RT at 169:14–171:1, 171:8–172:1, 173:22–175:1.

The record demonstrates that the complexity of the scientific and medical questions at issue in IR claims frequently makes expert testimony and opinion of great importance. Attorneys are skilled and experienced in working with experts in support of legal claims. In the case of IR claims, experts must examine military service records, military medical records and numerous other documents which must be obtained through FOIA requests. Attorneys can effectively facilitate collection of these documents for use by experts. RT at 640:1–641:16, 2330:19–2332:4, 2352:22–2353:10. Attorneys are also trained to be and are effective at framing the legally relevant issues for experts and at understanding the legal standards by which those issues will be judged. This training would contribute substantially to the work of medical and scientific experts in IR claims. RT at 640:1–641:16, 2353:11–18, 1425:19–2427:3.

Based on the evidence presented at trial, the court finds unequivocally that attorneys would perform far better than volunteer service representatives in other areas which are key to proper presentation of an IR claim. Attorneys would conduct more detailed and thorough factual development. RT at 1074:13–1087:18, 1094:6–1096:22, 1104:6–1106:8, 1107:12–22, 1110:20–1115:3, 1116:15–25. Attorneys would respond to VA requests for information, rather than leaving the lay-claimant to his or her own devices to respond to complex questions. RT at 1747:4–1748:12. Attorneys are more likely to detect and respond to procedural violations by the VA and to ensure that the claimant effectively takes advantage of procedural protections such as the right to a hearing. RT at 182:23–183:15, 250:22–253:15. Attorneys are better able to track down the relevant regulations, manual provisions and internal documents of the VA in order to muster support for their clients' IR claims and to interpret the myriad of complex regulations and rules relating to IR cases. Moreover, attorneys, because of their training, can more competently prepare briefs and appellate papers, conduct legal research, apply the law to the facts, and bring legal challenges to mistaken agency interpretations of regulations and statutes. RT at 80:20–81:12, 131:22–132:2, 183:20–184:25, 1723:4–1726:19, 1170:1–1171:8, 1748:13–1751:17, 1152:23–1159:21, 1161:20–1164:22.

Finally, the evidence demonstrates that IR claimants who employ attorneys have had significantly higher success rates than those relying on service representatives. RT at 877:3–880:21, 980:12–982:15, 851:8–23, 984:16–987:11, 881:4–21, 957:16–958:10, Ex. B–22.

## CONCLUSIONS OF LAW

### I. *Due Process*

■ As discussed above, while the Supreme Court determined that the fee limitation challenged by plaintiffs was not unconstitutional on its face, it left open the possibility of a successful constitutional challenge by plaintiffs with complex claims different from the typical VA claim. *NARS II*, 473 U.S. at 337–38, 105 S.Ct. at 3197–98. The Court found that the record at the preliminary injunction stage did not identify a category of "complex cases" for which the process provided was insufficient. *Id.* at 329–330, 105 S.Ct. at 3193–94. The Court, however, recognized the possi-

bility that the fee limitation might be found unconstitutional as it applied to "some discrete class of complex cases." *Id.* at 337, 105 S.Ct. at 3198.

Plaintiffs returned to this court and proceeded only on claims based on ionizing radiation as a cause for disability or death. The evidence discussed in the findings of fact amply demonstrates that, because of the extreme complexity of governing law, applicable procedures, medical and scientific issues, and necessary factual development, IR claims are exceptionally complex and are thus distinguishable from those of the typical VA benefits claimant.

The complexity of establishing causation of cancer and other diseases by toxic agents has been well-recognized in the context of toxic tort suits. *See, e.g.,* Mark S. Ellinger, *DNA Diagnostic Technology: Probing the Problem of Causation in Toxic Torts,* 3 *Harv.J.L. & Tech.* 31 (1990); Charles Nesson, *Agent Orange Meets the Blue Bus: Factfinding at the Frontier of Knowledge,* 66 *B.U.L.Rev.* 521 (1986); Mary Carter Andrues, Note, *Proof of Cancer Causation in Toxic Waste Litigation: The Case of Determinacy Versus Indeterminacy,* 61 *S.Cal.L.Rev.* 2075 (1988); Note, *Developments in the Law: Toxic Waste Litigation,* 99 *Harv.L.Rev.* 1458, 1617–31 (1986); Steve Gold, Note, *Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion, and Statistical Evidence,* 96 *Yale L.J.* 376 (1986); Orrin E. Tilevitz, Note, *Judicial Attitudes Towards Legal and Scientific Proof of Cancer Causation,* 3 *Colum.J. Envtl.L.* 344 (1977).

"The latency factor as well as the background incidence of [these diseases] … engender a causal indeterminacy which hampers the ability to isolate the substance which induced the injury." *Elam v. Alcolac, Inc.,* 765 S.W.2d 42, 173–74 (W.D.Mo. 1988). In this opinion of over two hundred pages, one appellate court demonstrated the extraordinary difficulties in establishing causation where toxic agents and a myriad of symptoms are involved. Uncertainty and disagreements within the scientific community make it difficult even for persons trained in the law to present a cogent, persuasive case. *See Rubanick v. Witco Chemical Corp.,* 125 N.J. 421, 593 A.2d 733 (1991) (citing to a number of cases confronting the evidentiary and causation difficulties in toxic tort type cases). It is a daunting, if not impossible, task for a layperson or one without access to legal resources to compile evidence that is methodologically sound and will pass muster.

As can be seen in this court's findings above, the complexities and uncertainties in IR cases are even greater than most of the difficult toxic tort cases. Applying the *Mathews* test to the evidence in the record regarding IR claims, the court concludes as a matter of law both that the "private interest" at stake in IR claims is great and that the risk of erroneous deprivation of that interest is high. *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903.

The court further concludes that those features of the existing adjudication procedure which are intended to safeguard the interests of the IR claimant in fact do not serve that purpose. Specifically, the court concludes that the regulatory presumptions in favor of the claimant, the supposedly informal and non-adversarial nature of the VA adjudication procedure for IR claims, and the availability of service representatives from volunteer veterans organizations do not contribute in any significant way to ensuring that the legitimate interests of the claimant are protected and that IR claims are properly adjudicated.

In addition, the court concludes, based on the above findings of fact, that allowing IR claimants access to attorneys would be of great value as a procedural safeguard. Attorneys would provide extremely valuable and presently unavailable assistance to claimants in such key areas as factual development, marshalling of expert opinion on scientific and medical issues in dispute and effective utilization of statutorily guaranteed procedural rights. Volunteer service representatives are not effectively providing such assistance to claimants.

Having arrived at these conclusions of law, under the terms of *Mathews* the court must now examine the government interest in adhering to the challenged system. The

Supreme Court, in reversing the preliminary injunction order, identified the government interest at stake as follows:

> that the system for administering benefits should be managed in a sufficiently informal way that there should be no need for the employment of an attorney to obtain benefits to which a claimant was entitled, so that the claimant would receive the entirety of the award without having to divide it with a lawyer.

*NARS II*, 473 U.S. at 321, 105 S.Ct. at 3189. The Court further stated that the government interest identified was reinforced by an absolute prohibition on compensation of any service organization representative. *Id.* at 321–22, 105 S.Ct. at 3189–90. Fearing that "destruction of the fee limitation would bid fair to complicate a proceeding which Congress wished to keep as simple as possible" and that the VA adjudication system would be "rendered more adversary and more complex by the very presence of lawyer representation," the Court accorded great weight to the government interest. *Id.* at 326, 105 S.Ct. at 3192.

Regardless of the merit of the Court's analysis at the time, subsequent develop-

ments have robbed it of all validity.[10] In 1988, Congress passed into law and the President signed the Veterans' Judicial Review Act of 1988 ("JRA"), P.L. 100–687, which partially repeals the challenged fee limitation and allows those veteran claimants who file a Notice of Disagreement with the Veterans Administration to retain an attorney for any proceedings following the Board of Veterans' Appeals initial final decision on a benefits claim. Consistent with the government's interest in protecting veterans from unscrupulous attorneys, the JRA requires BVA review and approval of the fee agreement between the claimant and retained counsel and limits contingency fees to twenty percent of the claimant's total benefit award. 38 U.S.C. § 3404(c)(2), (d)(1).

As enactment of the JRA makes clear, Congress and the President have determined that the challenged fee limitation is not in the national interest and that that interest instead requires allowing veteran claimants to utilize attorneys in VA proceedings after the BVA's initial final decision. Congress and the President have now clearly spoken on the nature of the

---

10. Chief Justice Rehnquist's analysis implies that the real goal of the fee limitation was to prevent attorneys from participating in the adjudication of veterans' benefit claims, since only this would realize the government interest identified by the Court, i.e., preserving the "simple" nature of the procedures by keeping attorneys out. In fact, as Justice Stevens pointed out in his dissent in *NARS II*, the purpose of the fee limitation when enacted was not to protect veterans from unscrupulous lawyers. *NARS II*, 473 U.S. at 360, 105 S.Ct. at 3209 (Stevens, J., dissenting). A $10 fee in 1862, the year the fee limitation was enacted, was roughly equivalent to a $580 fee today. *Id.* at 361, 105 S.Ct. at 3210. Thus, the fee limitation initially allowed for the employment of an attorney by a veteran claimant while the fee limitation at present does not.

Moreover, even prior to the passage of the Judicial Review Act of 1988, which definitively laid to rest the Chief Justice's government interest analysis, there were strong indications that the fee limitation, as written, no longer served a legitimate interest. In 1982 the Senate Committee on Veteran Affairs had the following to say about the fee limitation:

> [T]he basis for Congressional action, first after the Civil War and then after World War I, limiting the amount an attorney could receive for representing a claimant before the VA was

grounded in the belief that the lawyers of that day were unscrupulous and were taking unfair advantage of veterans' ... Whatever the merits of such a view at the time the limitation was imposed, ... it is the Committee's position that such a view of today's organized bar, particularly in light of the widespread network of local bar associations that now generally police attorney behavior, is no longer tenable.

> The Committee is also of the view that the current statutory limitation is an undue hindrance on the rights of veterans and other claimants to select representatives of their own choosing to represent them in VA matters.... [A]n individual should not be arbitrarily restricted in retaining an attorney, whether such representation is desired for reasons of personal preference or because of a concern that the claim is likely to be denied a second time by the Board of Veterans' Appeals and will be appealed to court. A claimant could well conclude, for example, that some further development of the administrative record in a complex case would be of critical importance while the matter is still before the agency and that an attorney would be better able to so develop the record.

S.Rep. No. 97–466, 97th Cong., 2d Sess. at 50–51 (1982).

government interest in these matters, and this court cannot and will not question this determination.

It is true that the JRA does not eliminate the fee limitation for claimants who filed their Notice of Disagreement prior to November 18, 1988, the date the law was enacted. Indeed, those claimants form the remainder of the class with active claims in this litigation. However, this court can conceive of no rational manner in which the government interest with regard to attorney participation in the VA adjudication process could be one thing for claimants who filed their NOD prior to November 18, 1988 and another for those who file after. Clearly, the adjudication process is the same for both groups of claimants, as is their need to be protected from unscrupulous attorneys.

In addition, in December 1988 the VA adopted new regulations which state, in relevant part, that an attorney "may receive a fee or salary in excess of the statutory limit from an organization, governmental entity or other disinterested third party for representation of a claimant." 38 CFR § 14.634(a). The regulation exempts veterans' organizations and other interested groups from the $10 fee limit. Here again, the court cannot conceive of any rational government interest which would be served by effectively preventing individual claimants from retaining the assistance of counsel for adjudication of their VA claims when non-profit organizations may retain these same attorneys for the same purpose.

Finally, there is no evidence in the record and no reason to believe that the costs of administration of the IR claim adjudication system would increase because a claimant is represented by counsel as opposed to being represented by a volunteer service representative or appearing *pro se*. *NARS II*, 473 U.S. at 363, 105 S.Ct. at 3211 (Stevens, J., dissenting).

Therefore, this court concludes that the government has no significant interest in retaining the challenged fee limitation. Plaintiffs have made an extraordinarily strong showing of the probability of erroneous denial of ionizing radiation claims under the existing system, and an equally strong showing that assistance of counsel will sharply reduce that possibility. Given the absence of any countervailing government interest, the court concludes that, as a matter of law, the $10 fee limitation violates the due process rights of ionizing radiation claimants and is thus unconstitutional.[11]

## II. *First Amendment*

■ Plaintiffs maintain that the fee limitation violates the First Amendment by denying them the right to petition the government for redress, which includes the right to meaningful access to adjudication.[12]

In reversing the preliminary injunction order in this case, the Supreme Court expressed reservations regarding some elements of this court's First Amendment analysis. *See NARS II*, 473 U.S. at 334–35, 105 S.Ct. at 3196–97. For example, the Court noted perceived "conceptual difficul-

11. The case at bar is easily distinguishable from the Supreme Court's recent decision in *United States Department of Labor v. Triplett*, 494 U.S. 715, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990). That case involved a due process challenge to a statute which allows for payment of a "reasonable attorney's fee" to an attorney who successfully represents a black lung claimant but requires that the fee be approved by the appropriate government agency. *Triplett*, 110 S.Ct. at 1430. The $10 fee limitation at issue here, of course, does not provide for a reasonable attorney's fee for the attorneys of IR claimants. Moreover, in *Triplett* the Court ruled that the challenged statute did not violate due process because the record did not establish that, as a result of the fee restriction, attorneys were un-

available to black lung claimants. *Triplett*, 110 S.Ct. at 1433–35. In contrast, in the case at bar both the record and common sense lead to the inexorable conclusion that the $10 fee limitation make attorneys unavailable to ionizing radiation claimants. Indeed, the Supreme Court assumed this to be the case even based on the limited record before it at the preliminary injunction stage. *Triplett*, 110 S.Ct. at 1433.

12. Plaintiffs also argued that the fee limitation violated the right of plaintiff NARS to offer its members competent legal representation. With the enactment of 38 CFR § 14.634(a), which exempts voluntary organizations such as NARS from the fee limitation, this claim is now moot.

ties" in applying *United Mine Workers,* 389 U.S. 217, 88 S.Ct. 353, and *Brotherhood of Railroad Trainmen,* 377 U.S. 1, 84 S.Ct. 1113, which were cited in the preliminary injunction order, to the case at bar. *NARS II,* 473 U.S. at 334, 105 S.Ct. at 3196. The Court also labelled as a "questionable proposition" the notion that IR claimants have a First Amendment right to retain a "surrogate speaker" to speak for them in VA adjudication proceedings. *Id.* at 335, 105 S.Ct. at 3196. Ultimately, however, the Court deemed plaintiffs' First Amendment argument unpersuasive because, on the record at the preliminary injunction stage, the Court found that plaintiffs had an opportunity to make a meaningful presentation under the existing VA claims process.

While the record before the Supreme Court at the preliminary injunction stage was limited, it is now fully developed. As the above findings of fact and conclusions of law with regard to plaintiffs' due process claim make clear, this court has now determined that the system challenged by plaintiffs does not afford IR claimants a meaningful opportunity to present their claim to the government in light of the intricacies of the governing law and adjudication process at issue, the substantive complexities of ionizing radiation claims, and the illusory nature of existing safeguards to claimants' interests. The court, therefore, must determine whether this infringes on plaintiffs' First Amendment rights.

Application of the union cases and *Button* in the instant litigation may well present some "conceptual difficulties" because those cases involve the right of organizations to seek legal representation for constituents, while the right of the individuals themselves to legal representation is at issue in the instant case. On closer examination, however, this distinction alone is not dispositive. As the Supreme Court has made clear,

> [u]nderlying [these cases] was the Court's concern that the aggrieved receive information regarding their legal rights and the means of effectuating them. *This concern applies with at least as much force to aggrieved individuals as it does to groups.*

*Bates v. State Bar of Arizona,* 433 U.S. 350, 376 n. 32, 97 S.Ct. 2691, 2705 n. 32, 53 L.Ed.2d 810, *reh'g denied,* 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977) (emphasis added). Lower courts have not limited application of *Button* and the union cases to situations involving organizational legal action. *See Rizzo v. Dawson,* 778 F.2d 527, 531 (9th Cir.1985) (invoking *Button* in support of proposition that actions of a prisoner who assisted fellow prisoners in preparing habeas petitions were protected by the First Amendment); *DeLoach v. Bevers,* 922 F.2d 618, 620 (10th Cir.1990) *cert. denied, Welsh v. DeLoach,* — U.S. ——, 112 S.Ct. 65, 116 L.Ed.2d 41 (1991) (citing *Button* and *United Mine Workers* to support ruling in section 1983 action that retaliation for plaintiff's decision to retain counsel when a suspect in a criminal prosecution could constitute a violation of plaintiff's First Amendment right of association and free speech); *Owens v. Rush,* 654 F.2d 1370, 1379 (10th Cir.1981) (citing *Button* to support ruling that husband's activities, assisting spouse in preparation of Title VII law suit, were protected by the First Amendment). This court thus concludes that the First Amendment guarantees an individual meaningful access to the adjudicatory process and protects efforts to obtain legal representation to effectuate this access.

The weight of plaintiffs' First Amendment interests is not diminished because ionizing radiation claimants seek meaningful access to the adjudication procedures of an administrative agency. As the Supreme Court observed in *California Motor Transp. Co. v. Trucking Ltd.,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972), the First Amendment protects the right to petition an administrative agency:

> [t]he same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government. . . . the right of access to the courts is indeed but one aspect of the right to petition.

The fact that plaintiffs in this case seek economic compensation from the VA for the health repercussions of exposure to ionizing radiation, rather than seeking only to make a political statement through their actions, does not deny plaintiffs First Amendment protection. *See, e.g., United Mine Workers*, 389 U.S. at 221–22, 88 S.Ct. at 355–56 (First Amendment gives union right to hire attorney to assist members in processing of workers' compensation claims). Moreover, as the tremendous public interest generated by this case and the flurry of legislative activity with regard to "atomic veterans" demonstrates, the ionizing radiation claims at issue here implicate important political values. Indeed, ionizing radiation claimants have found themselves at the center of a political controversy concerning the safety of nuclear testing and weapons and the government's responsibility to provide for veterans allegedly exposed to radiation during military service.

It is also now beyond question that the First Amendment protects plaintiffs' right to pay another to assist them in effectuating their right to petition. In *Meyer v. Grant*, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), the Supreme Court struck down a Colorado statute prohibiting payment of initiative petition circulators, holding that the statute infringed on appellees' First Amendment right to petition the government and was not narrowly tailored to achieve the government's stated goal. The *Meyer* Court also rejected the argument that appellees had other effective means to disseminate their ideas, observing that "[t]he First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer*, 486 U.S. at 424, 108 S.Ct. at 1893.

If anything, plaintiffs' position is more compelling than that of appellees in *Meyer*. As this court's findings of fact demonstrate, retaining counsel is often plaintiffs *only* means of effectively pursuing their ionizing radiation claims. In such a context, there can be no doubt that plaintiffs' First Amendment right encompasses the right to pay an attorney for legal assistance and the $10 fee limitation trammels plaintiffs' First Amendment interests.

Restrictions on First Amendment interests pass constitutional muster only when they are narrowly tailored to serve a legitimate state interest. *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781, 789, 108 S.Ct. 2667, 2673, 101 L.Ed.2d 669 (1988). As discussed above, the Veterans' Judicial Review Act, removes the $10 fee limitation for many ionizing radiation claimants. As a result, the government can hardly maintain that it has a continued interest in preserving the supposed "informal" and "non-adversarial" nature of the VA adjudication process by effectively denying attorneys to those not covered by the terms of the JRA. Even assuming *arguendo* that the state could legitimately retain an interest in protecting those IR claimants not affected by the JRA from unscrupulous lawyers, this "paternalistic" government interest could not counterbalance the plaintiffs' First Amendment rights. In *Riley*, the state of North Carolina attempted to defend statutory limits on the fees of professional solicitors of charitable contributions with "the paternalistic premise that charities' speech must be regulated for their own benefit." 487 U.S. at 790, 108 S.Ct. at 2674. Finding this purported government interest to be unsound, the Court noted:

[t]he First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it. . . . To this end, the government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners . . .

*Id.*, 487 U.S. at 790–91, 108 S.Ct. at 2674–75 (citations omitted).

Moreover, even if there were legitimate government interests at stake in this case, the fee limitation is not narrowly tailored to serve them. For example, the state's paternalistic interest in protecting IR claimants from unscrupulous attorneys would be equally served by the type of "reasonable fee" provision contained in the JRA, while at the same time allowing IR

claimants the opportunity to obtain legal representation. In addition, the government might temper the formality and adversarial nature of the IR claim adjudication process by, for example, limiting the number of hearings, the length of written submissions, and the time for argument. *See NARS II,* 473 U.S. at 363, 105 S.Ct. at 3211 (Stevens, J., dissenting).

For the foregoing reasons, the court concludes that the $10 fee limitation violates plaintiffs' First Amendment right to free speech and to petition the government.

CONCLUSION

In light of the above findings of fact and conclusions of law, the court rules that the $10 fee limitation violates plaintiffs' constitutional rights under both the Fifth and First Amendments.

IT IS SO ORDERED.