# MEYER, COLORADO SECRETARY OF STATE, ET AL. v. GRANT ET AL.

No. 87–920.   Argued April 25, 1988—Decided June 6, 1988

STEVENS, J., delivered the opinion for a unanimous Court.

*Maurice G. Knaizer*, First Assistant Attorney General of Colorado, argued the cause for appellants. With him on the briefs were *Duane Woodard*, Attorney General, *pro se*, *Richard H. Forman*, Solicitor General, and *Charles B. Howe* and *Billy J. Shuman*, Deputy Attorneys General.

*William C. Danks* argued the cause and filed a brief for appellees.*

JUSTICE STEVENS delivered the opinion of the Court.

In Colorado the proponents of a new law, or an amendment to the State Constitution, may have their proposal placed on the ballot at a general election if they can obtain enough signatures of qualified voters on an "initiative petition" within

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *James J. Sandman, Steven R. Shapiro*, and *John A. Powell;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Paul D. Kamenar*.

a 6-month period. One section of the state law regulating the initiative process makes it a felony to pay petition circulators.[1] The question in this case is whether that provision is unconstitutional. The Court of Appeals for the Tenth Circuit, sitting en banc, held that the statute abridged appellees' right to engage in political speech and therefore violated the First and Fourteenth Amendments to the Federal Constitution. We agree.

I

Colorado is one of several States that permits its citizens to place propositions on the ballot through an initiative process. Colo. Const., Art. V, § 1; Colo. Rev. Stat. §§ 1–40–101 to 1–40–119 (1980 and Supp. 1987). Under Colorado law, proponents of an initiative measure must submit the measure to the State Legislative Council and the Legislative Drafting Office for review and comment. The draft is then submitted to a three-member title board, which prepares a title, submission clause, and summary. After approval of the title, submission clause, and summary, the proponents of the measure then have six months to obtain the necessary signatures, which must be in an amount equal to at least five percent of the total number of voters who cast votes for all candidates for the Office of Secretary of State at the last preceding general election. If the signature requirements are met, the petitions may be filed with the Secretary of State, and the measure will appear on the ballot at the next general election. Colo. Rev. Stat. §§ 1–40–101 to 1–40–105 (1980 and Supp. 1987).

---

[1] Colorado Rev. Stat. § 1–40–110 (1980) provides:

"Any person, corporation, or association of persons who directly or indirectly pays to or receives from or agrees to pay to or receive from any other person, corporation, or association of persons any money or other thing of value in consideration of or as an inducement to the circulation of an initiative or referendum petition or in consideration of or as an inducement to the signing of any such petition commits a class 5 felony and shall be punished as provided in section 18–1–105, C. R. S. (1973)."

State law requires that the persons who circulate the approved drafts of the petitions for signature be registered voters. Colo. Const., Art. V, § 1(6). Before the signed petitions are filed with the Secretary of State, the circulators must sign affidavits attesting that each signature is the signature of the person whose name it purports to be and that, to the best of their knowledge and belief, each person signing the petition is a registered voter. Colo. Rev. Stat. § 1–40–109 (Supp. 1987). The payment of petition circulators is punished as a felony. Colo. Rev. Stat. § 1–40–110 (1980), n. 1, *supra.*

Appellees are proponents of an amendment to the Colorado Constitution that would remove motor carriers from the jurisdiction of the Colorado Public Utilities Commission. In early 1984 they obtained approval of a title, submission clause, and summary for a measure proposing the amendment and began the process of obtaining the 46,737 signatures necessary to have the proposal appear on the November 1984 ballot. Based on their own experience as petition circulators, as well as that of other unpaid circulators, appellees concluded that they would need the assistance of paid personnel to obtain the required number of signatures within the allotted time. They then brought this action under 42 U. S. C. § 1983 against the Secretary of State and the Attorney General of Colorado seeking a declaration that the statutory prohibition against the use of paid circulators violates their rights under the First Amendment.[2]

---

[2] Although the November 1984 election in which appellees had first hoped to present their proposal to the citizens of Colorado is long past, we note that this action is not moot. Neither party suggests that the action is moot. Rather, both assert that the controversy between them is one capable of repetition, yet evading review.

We may exercise jurisdiction over this action if "'(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.'" *Murphy* v. *Hunt,* 455 U. S. 478, 482 (1982) *(per curiam),* quoting *Weinstein*

After a brief trial, the District Judge entered judgment upholding the statute on alternative grounds. First, he concluded that the prohibition against the use of paid circulators did not burden appellees' First Amendment rights because it did not place any restraint on their own expression or measurably impair efforts to place initiatives on the ballot.[3] The restriction on their ability to hire paid circulators to speak for them was not significant because they remained free to use their money to employ other spokesmen who could advertise their cause. Second, even assuming, *arguendo*, that the statute burdened appellees' right to engage in political speech, the District Judge concluded that the burden was justified by the State's interests in (a) making sure that an

---

v. *Bradford*, 423 U. S. 147, 149 (1975) *(per curiam)*. We are satisfied that both elements are present in this case. Colorado grants the proponents of an initiative only six months in which to obtain the necessary signatures. The likelihood that a proponent could obtain a favorable ruling within that time, much less act upon such a ruling in time to obtain the needed signatures, is slim at best. Further, the initiative sought by appellees has not been enacted. Appellees, however, continue to advocate its adoption and plan future attempts to obtain the signatures necessary to place the issue on the ballot. Tr. of Oral Arg. 37. Consequently, it is reasonable to expect that the same controversy will recur between these two parties, yet evade meaningful judicial review. See *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 774–775 (1978); *Moore* v. *Ogilvie*, 394 U. S. 814 (1969).

[3] In support of its conclusion that the prohibition against the use of paid circulators did not inhibit the placement of initiative measures on the general ballot, the District Court compared Colorado's experience with that of 20 States which have an initiative process but do not prohibit paid circulators. It noted that since 1910, Colorado has ranked fourth in the total number of initiatives placed on the ballot. This statistic, however, does not reject the possibility that even more petitions would have been successful if paid circulators had been available, or, more narrowly, that these appellees would have had greater success if they had been able to hire extra help. As the District Court itself noted, "the evidence indicates [appellees'] purposes would be enhanced if the corps of volunteers could be augmented by a cadre of paid workers." 741 F. 2d 1210, 1212 (CA10 1984) (Appendix).

initiative measure has a sufficiently broad base to warrant its placement on the ballot, and (b) protecting the integrity of the initiative process by eliminating a temptation to pad petitions.

A divided panel of the Court of Appeals affirmed for the reasons stated by the District Court. After granting rehearing en banc, however, the court reversed. The en banc majority concluded that the record demonstrated that petition circulators engage in the communication of ideas while they are obtaining signatures and that the available pool of circulators is necessarily smaller if only volunteers can be used.

> "Thus, the effect of the statute's absolute ban on compensation of solicitors is clear. It impedes the sponsors' opportunity to disseminate their views to the public. It curtails the discussion of issues that normally accompanies the circulation of initiative petitions. And it shrinks the size of the audience that can be reached. . . . In short, like the campaign expenditure limitations struck down in *Buckley*, the Colorado statute imposes a direct restriction which 'necessarily reduces the quantity of expression . . . .' *Buckley* [v. *Valeo*], 424 U. S. [1,] 19 [(1976)]." 828 F. 2d 1446, 1453–1454 (CA10 1987) (citations omitted).

The Court of Appeals then rejected the State's asserted justifications for the ban. It first rejected the suggestion that the ban was necessary either to prevent fraud or to protect the public from circulators that might be too persuasive:

> "The First Amendment is a value-free provision whose protection is not dependent on 'the truth, popularity, or social utility of the ideas and beliefs which are offered.' *NAACP* v. *Button*, [371 U. S. 415, 445 (1963)]. 'The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind . . . . In this field every person must be his

own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us.' *Thomas* v. *Collins*, [323 U. S. 516, 545 (1945)] (Jackson, J., concurring)." *Id.*, at 1455.

The court then rejected the suggestion that the ban was needed to assure that the initiative had a broad base of public support because, in the court's view, that interest was adequately protected by the requirement that the petition be signed by five percent of the State's eligible voters. Finally, the Court of Appeals rejected an argument advanced by a dissenting judge that since Colorado had no obligation to afford its citizens an initiative procedure, it could impose this condition on its use. Having decided to confer the right, the State was obligated to do so in a manner consistent with the Constitution because, unlike *Posadas de Puerto Rico Associates* v. *Tourism Co. of Puerto Rico*, 478 U. S. 328 (1986), which involved only commercial speech, this case involves "core political speech."

## II

We fully agree with the Court of Appeals' conclusion that this case involves a limitation on political expression subject to exacting scrutiny. *Buckley* v. *Valeo*, 424 U. S. 1, 45 (1976). The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances." The Fourteenth Amendment makes that prohibition applicable to the State of Colorado. As we explained in *Thornhill* v. *Alabama*, 310 U. S. 88, 95 (1940), "[t]he freedom of speech and of the press, which are secured by the First Amendment against abridgment by the United States, are among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State."

Unquestionably, whether the trucking industry should be deregulated in Colorado is a matter of societal concern that appellees have a right to discuss publicly without risking criminal sanctions. "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Id.*, at 101–102. The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth* v. *United States*, 354 U. S. 476, 484 (1957). Appellees seek by petition to achieve political change in Colorado; their right freely to engage in discussions concerning the need for that change is guarded by the First Amendment.

The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it.[4] Thus, the circulation of a petition involves the type of

---

[4] The record in this case demonstrates that the circulation of appellees' petition involved political speech. Paul Grant, one of the appellees, testified about the nature of his conversations with voters in an effort to get them to sign the petition:

"[T]he way we go about soliciting signatures is that you ask the person—first of all, you interrupt the person in their walk or whatever they are doing. You intrude upon them and ask them, "Are you a registered voter?

.        .        .        .        .

"If you get a yes, then you tell the person your purpose, that you are circulating a petition to qualify the issue on the ballot in November, and tell them what about, and they say, 'Please let me know a little bit more.' Typically, that takes maybe a minute or two, the process of explaining

interactive communication concerning political change that is appropriately described as "core political speech."[5]

The refusal to permit appellees to pay petition circulators restricts political expression in two ways: First, it limits the number of voices who will convey appellees' message and the

---

to the persons that you are trying to put the initiative on the ballot to exempt Colorado transportation from [State Public Utilities Commission] regulations.

"Then you ask the person if they will sign your petition. If they hesitate, you try to come up with additional arguments to get them to sign.

.        .        .        .        .

"[We try] to explain the not just deregulation in this industry, that it would free up to industry from being cartelized, allowing freedom from moral choices, price competition for the first time, lowering price costs, which we estimate prices in Colorado to be $150 million a year in monopoly benefits. We have tried to convey the unfairness and injustice of the existing system, where some businesses are denied to go into business simply to protect the profits of existing companies.

"We tried to convey the unfairness of the existing system, which has denied individuals the right to start their own businesses. In many cases, individuals have asked for an authority and been turned down because huge corporate organizations have opposed them." 2 Record 10–11.

This testimony provides an example of advocacy of political reform that falls squarely within the protections of the First Amendment.

[5] Our recognition that the solicitation of signatures for a petition involves protected speech follows from our recognition in *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620 (1980), that the solicitation of charitable contributions often involves speech protected by the First Amendment and that any attempt to regulate solicitation would necessarily infringe that speech:

"Prior authorities, therefore, clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests — communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes — that are within the protection of the First Amendment. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease." *Id.*, at 632.

hours they can speak and, therefore, limits the size of the audience they can reach.[6]   Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion. The Colorado Supreme Court has itself recognized that the prohibition against the use of paid circulators has the inevitable effect of reducing the total quantum of speech on a public issue.   When called upon to consider the constitutionality of the statute at issue here in another context in *Urevich* v. *Woodard*, 667 P. 2d 760, 763 (1983), that court described the burden the statute imposes on First Amendment expression:

> "As mentioned previously, statutes that limit the power of the people to initiate legislation are to be closely scrutinized and narrowly construed.   That the statute in question acts as a limitation on ACORN's ability to circulate petitions cannot be doubted.   We can take judicial notice of the fact that it is often more difficult to get people to work without compensation than it is to get them to work for pay.   As the dissent in *State* v. *Conifer Enterprises, Inc.*, 82 Wash. 2d 94, [104,] 508 P. 2d 149[, 155] (1973) (Rosellini, J., dissenting), observed:
>
> "'The securing of sufficient signatures to place an initiative measure on the ballot is no small undertaking.   Unless the proponents of a measure can find a large number of volunteers, they must hire persons to solicit signatures or abandon the project.   I think we can take judicial notice of the fact that the solicitation of signatures on petitions is work.   It is time-consuming and it is tire-

---

[6] Paul Grant testified that compensation resulted in more people being "able and willing" to circulate petitions.   2 Record 19–20.   As he succinctly concluded: "[M]oney either enables people to forego leaving a job, or enables them to have a job."   *Ibid.*

some—so much so that it seems that few but the young have the strength, the ardor and the stamina to engage in it, unless, of course, there is some remuneration.'"

Appellants argue that even if the statute imposes some limitation on First Amendment expression, the burden is permissible because other avenues of expression remain open to appellees and because the State has the authority to impose limitations on the scope of the state-created right to legislate by initiative. Neither of these arguments persuades us that the burden imposed on appellees' First Amendment rights is acceptable.

That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection. Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. That it leaves open "more burdensome" avenues of communication, does not relieve its burden on First Amendment expression. *FEC* v. *Massachusetts Citizens For Life, Inc.*, 479 U. S. 238 (1986). Cf. *Citizens Against Rent Control* v. *Berkeley*, 454 U. S. 290, 296, 299 (1981). The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.

Relying on *Posadas de Puerto Rico Associates* v. *Tourism Co. of Puerto Rico*, 478 U. S. 328 (1986), Colorado contends that because the power of the initiative is a state-created right, it is free to impose limitations on the exercise of that right. That reliance is misplaced. In *Posadas* the Court concluded that "the greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling." *Id.*, at 345–346. The Court of Appeals quite properly pointed out the logical flaw in Colorado's attempt to draw an analogy between the present case and *Posadas*. The decision in *Posadas* does not suggest that "the power to

ban casino gambling entirely would include the power to ban public discussion of legislative proposals regarding the legalization and advertising of casino gambling." 828 F. 2d, at 1456. Thus it does not support the position that the power to ban initiatives entirely includes the power to limit discussion of political issues raised in initiative petitions. And, as the Court of Appeals further observed:

> "*Posadas* is inapplicable to the present case for a more fundamental reason—the speech restricted in *Posadas* was merely 'commercial speech which does "no more than propose a commercial transaction . . . ."'  *Posadas*, [478 U. S., at 340] (quoting *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 762 (1976)). . . . Here, by contrast, the speech at issue is 'at the core of our electoral process and of the First Amendment freedoms,' *Buckley*, 424 U. S., at 39 (quoting *Williams* v. *Rhodes*, 393 U. S. 23, 32 (1968))— an area of public policy where protection of robust discussion is at its zenith." *Id.*, at 1456–1457.

We agree with the Court of Appeals' conclusion that the statute trenches upon an area in which the importance of First Amendment protections is "at its zenith." For that reason the burden that Colorado must overcome to justify this criminal law is well-nigh insurmountable.

## III

We are not persuaded by the State's arguments that the prohibition is justified by its interest in making sure that an initiative has sufficient grass roots support to be placed on the ballot, or by its interest in protecting the integrity of the initiative process. As the Court of Appeals correctly held, the former interest is adequately protected by the requirement that no initiative proposal may be placed on the ballot

unless the required number of signatures has been obtained. *Id.*, at 1455.[7]

The State's interest in protecting the integrity of the initiative process does not justify the prohibition because the State has failed to demonstrate that it is necessary to burden appellees' ability to communicate their message in order to meet its concerns. The Attorney General has argued that the petition circulator has the duty to verify the authenticity of signatures on the petition and that compensation might provide the circulator with a temptation to disregard that duty. No evidence has been offered to support that speculation, however, and we are not prepared to assume that a professional circulator—whose qualifications for similar future assignments may well depend on a reputation for competence and integrity—is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot.

Other provisions of the Colorado statute deal expressly with the potential danger that circulators might be tempted

---

[7] Colorado also seems to suggest that it is permissible to mute the voices of those who can afford to pay petition circulators. See Brief for Appellants 17. "But the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley* v. *Valeo*, 424 U. S. 1, 48–49 (1976). The concern that persons who can pay petition circulators may succeed in getting measures on the ballot when they might otherwise have failed cannot defeat First Amendment rights. As we said in *First National Bank of Boston* v. *Bellotti*, 435 U. S., at 790–791, paid advocacy "may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it . . . . '[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment . . . .' *Buckley*, 424 U. S., at 48–49. . . . [T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments." Cf. *Brown* v. *Hartlage*, 456 U. S. 45, 60 (1982) ("The State's fear that voters might make an ill-advised choice does not provide the State with a compelling justification for limiting speech").

to pad their petitions with false signatures. It is a crime to forge a signature on a petition, Colo. Rev. Stat. § 1–13–106 (1980), to make false or misleading statements relating to a petition, Colo. Rev. Stat. § 1–40–119 (Supp. 1987), or to pay someone to sign a petition, Colo. Rev. Stat. § 1–40–110 (1980). Further, the top of each page of the petition must bear a statement printed in red ink warning potential signatories that it is a felony to forge a signature on a petition or to sign the petition when not qualified to vote and admonishing signatories not to sign the petition unless they have read and understand the proposed initiative.[8] These provisions seem adequate to the task of minimizing the risk of improper conduct in the circulation of a petition, especially since the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting. Cf. *First National Bank of Boston* v. *Bellotti*, 435

---

[8] Section 1–40–106 provides in part:

"(1) At the top of each page of every initiative or referendum petition shall be printed, in plain red letters no smaller than the impression of ten-point, boldface type, the following:

**"WARNING**
**"IT IS A FELONY:**

"For anyone to sign any initiative or referendum petition with any name other than his or her own or to knowingly sign his or her name more than once for the same measure or to sign such petition when not a qualified elector.

**"DO NOT SIGN THIS PETITION UNLESS YOU ARE A**
**"QUALIFIED ELECTOR**

**"TO BE A QUALIFIED ELECTOR, YOU MUST BE:**

  "(a) At least eighteen years of age.
  "(b) A citizen of the United States.
  "(c) A resident of the state of Colorado and have resided in the state at least thirty-two days.
  "(d) A resident of the precinct in which you live for at least thirty-two days.

"Do not sign this petition unless you have read or had read to you the proposed initiative or referred measure or the summary of an initiated measure in its entirety and understand its meaning."

U. S. 765, 790 (1978) ("The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue").

"[L]egislative restrictions on advocacy of the election or defeat of political candidates are wholly at odds with the guarantees of the First Amendment." *Buckley* v. *Valeo*, 424 U. S., at 50. That principle applies equally to "the discussion of political policy generally or advocacy of the passage or defeat of legislation." *Id.*, at 48. The Colorado statute prohibiting the payment of petition circulators imposes a burden on political expression that the State has failed to justify. The Court of Appeals correctly held that the statute violates the First and Fourteenth Amendments. Its judgment is therefore affirmed.

*It is so ordered.*