**The TERM LIMITS LEADERSHIP COUNCIL, INC. and Steven T. Kean, Plaintiffs,**

v.

**Eric CLARK, Mississippi Secretary of State; Mike Moore, Mississippi Attorney General, and the State of Mississippi, Defendants.**

**No. CIV. A. 3:96CV859LN.**

United States District Court,
S.D. Mississippi,
Jackson Division.

Aug. 28, 1997.

Dale F. Schwindaman, Jr., Herring & Schwindaman, Jackson, MS, for Plaintiffs.

Davis C. Scott, Jr., Geoffrey C. Morgan, Office of the Attorney General, Jackson, MS, for Defendants.

### MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

Plaintiffs The Term Limits Leadership Council, Inc. and Steven T. Kean, President of Mississippi Term Limits, proponents of a term limits initiative, filed this action pursuant to 42 U.S.C. § 1983 seeking a declaration that Miss.Code Ann. § 23–17–17(2), 23–17–57(3) and 23–17–23(c), are unconstitutional because they unduly restrict plaintiffs' right of free speech guaranteed by the First Amendment to the United States Constitution. Subsequent to filing suit, plaintiffs filed both a motion for summary judgment and a separate motion for preliminary injunction seeking to enjoin enforcement of these statutes. After the State of Mississippi filed its responses, the court conducted a hearing on the motions at which the parties presented argument and evidence in support of their respective positions. The court now finds and concludes that these statutes do violate

plaintiffs' First Amendment rights and are therefore invalid.

The first of the statutes challenged by plaintiffs in this case, Miss.Code Ann. § 23–17–17(2), states:

> Only a person who is a qualified elector of this state may circulate a petition or obtain signatures on a petition.

Plaintiffs also challenge Miss.Code Ann. § 23–17–57(3), which provides:

> It is unlawful for a person that pays or compensates another person for circulating a petition or for obtaining signatures on a petition to base the pay or compensation on the number of petitions circulated or the number of signatures obtained.

And finally, Miss.Code Ann. § 23–17–23(c), the third statute involved in this case, requires that the Secretary of State refuse to file any initiative petition on which one or more of the signatures has been obtained in violation of § 23–17–17(2) or § 23–17–57(3). In the court's opinion, whereas plaintiffs have shown that these statutes burden their right to political expression, the State has failed to present evidence of fraud or actual threat to its citizens' confidence in government on account of the per-signature payment of petition circulators, and therefore, *Meyer v. Grant*, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), compels the conclusion that § 23–17–57(3) constitutes an unconstitutional infringement on the freedom of political speech guaranteed by the First Amendment. The court further finds and concludes that the State has failed to demonstrate any reasonable, and much less any compelling justification for permitting signature gathering on initiative petitions only by registered Mississippi voters, and therefore, § 23–17–17(2) also violates the constitution.[1]

In *Meyer*, the Court struck down a Colorado statute which made it illegal to pay petition circulators. The statute, the Court concluded, imposed a burden on political expression that the state failed to justify. The Court held that the circulation of an initiative petition constitutes "core political speech," *id.* at 421–22, 108 S.Ct. at 1892, which was burdened in two ways by Colorado's ban on paying petition circulators:

> First, it limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.

*Id.* at 422–23, 108 S.Ct. at 1892. The Court concluded that the statute was subject to "exacting scrutiny," *id.* at 420, 108 S.Ct. at 1891; Colorado thus had the "well-nigh insurmountable" burden to justify the ban. *Id.* at 425, 108 S.Ct. at 1894. It failed to meet this burden because the reasons it gave for the restriction were not compelling. The Court held:

> The State's interest in protecting the integrity of the initiative process does not justify the prohibition because the State has failed to demonstrate that it is necessary to burden appellees' ability to communicate their message in order to meet its concerns. The Attorney General has argued that the petition circulator has the duty to verify the authenticity of signatures on the petition and that the compensation might provide the circulator with a temptation to disregard that duty. No evidence has been offered to support that speculation, however, and we are not prepared to assume that a professional circulator—whose qualifications for similar future assignments may well depend on a reputation for competence and integrity—is any more likely to accept false signa-

---

1. At the hearing, the State objected that one of the plaintiffs, Term Limits Leadership Council, Inc., having not qualified to do business in Mississippi, is barred by Mississippi's door closing statute from prosecuting this action. *See* Miss. Code Ann. § 79–4–15.02(a) ("A foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding in any court in this state until it obtains a certificate of authority."). The court is advised that Term Limits Leadership Council, Inc. has obtained, or is in the process of obtaining a certificate of authority, and the court could stay the case until presented with proof that this has been accomplished. *See id.* § 79–4–15.02(c). However, since there is at least one Party properly before the court, Steven T. Kean, no useful purpose would be served in doing so.

tures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot.

*Id.* at 426, 108 S.Ct. at 1894.

Based on *Meyer,* the district court in *Limit v. Maleng,* 874 F.Supp. 1138 (W.D.Wash. 1994), invalidated a Washington statute which, like Mississippi's statute, prohibited payment of petition circulators on initiative and referendum petitions on a per-signature basis. The State of Washington maintained that its statute was constitutionally permissible since unlike the Colorado statute at issue in *Meyer,* Washington's statute did not totally ban the payment of signature gatherers but rather merely banned the per-signature payment of circulators and that its statute was thus narrowly focused, content-neutral regulation intended to further the State's policy of protecting the integrity of the initiative process. *Id.* at 1140. The court agreed, as the *Meyer* Court had implicitly recognized, that protection of the integrity of the initiative process is a legitimate concern which the State may address through appropriately tailored legislation. *Id.* However, the court found that the State had concededly failed to adduce "actual proof of fraud stemming specifically from the payment per signature method of collection," and thus the State had failed to sustain its burden to justify the legislation. *Id.* at 1141. The court rejected the argument that the State of Washington needed only to show that the legislation was based on the legislators' perception that payment per signature encouraged fraud. Instead, in reliance on *Meyer,* the court held, "Unless there is some proof of fraud or actual threat to citizens' confidence in government which would provide a compelling justification, the right of public discussion of issues may not be infringed by laws restricting expenditures on referenda and initiative campaigns." *Id.* at 1141. Though *Limit* is obviously not binding on this court, the court concurs fully in the *Limit* court's reasoning, which flows directly from the Supreme Court's opinion in *Meyer.* It is in that light, therefore, that the court

has considered the parties' positions and reviewed their evidence.

■  In the case at bar, the State argues that because plaintiffs have presented no evidence of the types, substance or amount of political dialogue which they or their workers carry out while performing their tasks, then they have not shown that they are engaging in "core political speech." However, as the Supreme Court explained in *Meyer,* initiative petition circulation constitutes "core political speech" because it necessarily

involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it.

*Id.* at 422, 108 S.Ct. at 1891–92. Based on this reasoning, the State's objection that plaintiffs have failed to show that "core political speech" is involved should be rejected, particularly since at the hearing, plaintiffs did present evidence that dialogue between petition circulators and potential signatories does, indeed, typically entail at least an explanation of the petition.[2]

■  Plaintiffs also clearly demonstrated that the limitations imposed by the statutes at issue burden plaintiffs' political expression. Plaintiffs offered evidence that during three prior petition drives (relating to denturists, PRIME and annexation), nonresident petition circulators gathered approximately 84% of the total signatures, or 378,993 of the total of 449,740 signatures. The out-of-state circulators, who typically were professional petition circulators, gathered signatures with far greater efficiency than Mississippi circulators. More specifically, during the three referenced petition drives, in which 124 out-of-

2.  For this reason, the supplemental affidavit submitted by the State is not sufficient to create a

genuine issue of fact warranting a trial.

state circulators and 281 Mississippi circulators worked, the out-of-state circulators gathered an average of 3057 signatures per circulator whereas the Mississippi circulators gathered an average of only 251 signatures per circulator. And there was also uncontroverted evidence that out-of-state circulators have not been willing to work on any basis other than a payment per-signature basis. Additionally, there was uncontroverted evidence that payment of a flat daily rate to Mississippi circulators had yielded poor results. That is, they collected far fewer signatures than those paid per signature.

On the basis of this proof, it is apparent that the statutes under consideration make it "less likely" that plaintiffs will be able to garner a sufficient number of signatures to place their initiative on the ballot, and that the statutes "thus limit[ ] their ability to make the matter the focus of statewide discussion." *Meyer*, 486 U.S. at 423, 108 S.Ct. at 1892. Thus, according to the analysis in *Meyer*, the statutes burden plaintiffs' political expression. Nevertheless, the State submits that any burden on the plaintiffs' ability to disseminate their political thought posed by § 23–17–57(3) is insignificant (and hence permissible) since that statute only bans the per-signature payment of petition circulators and does not ban payment of circulators on an hourly or daily basis. Further, it submits that the fact that plaintiffs have available to them other methods by which to disseminate their ideas and thoughts (such as "interviews with newspaper people, opportunities to write opinion pieces in the newspaper, advertisements on radio and television and in newspapers, mail-outs, hand-outs and town meetings or similar in person gatherings") belies their claim that their right to political expression is significantly burdened.

The *Meyer* Court rejected a similar argument by the State of Colorado, stating:

That appellees remain free to employ other means to disseminate their ideas does not take their speech outside the bounds of First Amendment protection. Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. That it leaves open "more burdensome" avenues of communication does not relieve its burden on First Amendment expression. The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for doing so.

*Id.* at 424, 108 S.Ct. at 1893 (citations omitted). Inasmuch as plaintiffs maintain, and have adduced a wealth of evidence to support their assertion that payment of primarily out-of-state petition circulators is the "most effective" and "economical" avenue of political communication for them, *id.* at 424, 108 S.Ct. at 1893, the State cannot avoid strict scrutiny of the statutes, which is to say, it cannot avoid its burden to justify the statutes by demonstrating a compelling interest and showing further that the statutes are the least restrictive means of addressing the state's interest.

With respect to the adequacy of the proof presented by the State in an effort to sustain this burden, the court must agree with the plaintiffs' assessment: Defendants have not even remotely approached demonstrating a compelling state interest for the statutes.[3] The State of Mississippi asserts, as did Colorado in *Meyer* and Washington in *Limit*, that the legislature's passage of Miss.Code Ann. § 23–17–17(2) and § 23–17–57(3) was done for the purpose of protecting the integrity of the initiative process, and it claims that the statutes are narrowly focused, content-neu-

---

**3.** In *Limit*, the court noted that the plaintiffs had presented statistical data which showed that the highest rates of invalidity for recent initiative petition drives in Washington were found in drives which used only volunteer signature collectors. 874 F.Supp. at 1140 n. 3. The State of Mississippi argues that because the plaintiffs in the case at bar have not come forward with the type of evidence introduced by the *Limit* plaintiffs, then the plaintiffs herein "are not entitled to

have this Court assume, as was done in *Limit*, that 'pay per signature' gatherers are no more apt to commit fraud than are volunteers who are zealously working for their particular cause." This argument flies directly in the face of the Supreme Court's refusal in *Meyer* to assume that paid petition circulators were more likely to commit fraud than volunteers where Colorado had failed to present proof of its speculation that paid circulators were more apt to commit fraud.

tral regulations intended to accomplish this task. The State posits that out-of-state or non-registered Mississippi circulators taint and abuse the initiative process because they are "disinterested" in the initiatives and "disinterested circulators offer false and misleading information to passers-by in an effort to induce signatures." It further submits that paying circulators on a per-signature basis encourages fraud by those circulators since it gives them incentive to obtain signatures by any possible means, including fraud.

Defendants presented two witnesses at the hearing to substantiate the State's interest in, and the need for the challenged legislation. One was Senator David Jordan of Mississippi's Senate District 24 (which encompasses Holmes County and parts of LeFlore and Tallahatchie Counties), and the other was the principal sponsor of the legislation, State Representative Tomie Green of House District 72 (which covers west Jackson and parts of Hinds County). However, their testimony established little of probative value.

Senator Jordan admitted he had no personal knowledge of any fraud or wrongdoing or impropriety on the part of any nonresident or paid-per-signature circulator. Rather, he purported only to explain his motivation for supporting the legislation by reference to complaints he stated he had received from some of his constituents. The gist of his testimony was primarily that he voted in favor of the subject legislation because he had been informed that in prior initiative petition drives, a number of his mostly African–American constituents felt they had been "coerced" into signing petitions by fast-talking white petition circulators who never explained the content of the petitions or who misrepresented the peti-

tions. Senator Jordan understood that many of these constituents signed petitions even though they did not understand the petition process or what the petitions were about; and he speculated that they did so because they were afraid not to. That is, he believed that these African–American constituents still harbor a "basic fear" stemming from history of intimidation by whites in Mississippi in connection with their efforts to register to vote and to vote; and thus, when confronted by "[y]oung whites from out of state, talking fast, looking handsome and seeming as though they are right" these constituents signed the proffered petitions simply out of fear, and not because they understood what they were doing.[4] Senator Jordan was further concerned that to allow nonresidents to circulate petitions in this state was to allow outside interference with Mississippi politics by people who have no interest in what goes on in this state. He believed that his constituents, as Mississippians, can better relate to other Mississippians, whether black or white,[5] and that Mississippi circulators are "more likely [than out-of-staters] to give you the truth about the process." Finally, he objected to the per-signature payment of circulators because such method of remuneration, in his view, encouraged signature gatherers to "bounty hunt," seeking to get as many names as fast as they can and as unscrupulously as needed to get them.

·Jordan's implicit suggestion that the statutes at issue are justified by the fear of some of the State's black citizens stemming from their experience with or knowledge of past intimidation relating to voting is patently without merit.[6] Additionally, his speculation

---

**4.** Though in response to an inquiry from the court Senator Jordan attempted to clarify that his concern extended to all persons from out of state, white and black, it was manifest from his testimony that his primary objection was to white out-of-state circulators, for moments later, he stated, "When anybody comes up of another race, certainly a young white person, whom the basic fear has never left, they will do what they say. They are not going to challenge one way or the other. They are going to try to do what they ask them to do."

**5.** In this vein, he expressed concern that with nonresidents as petition circulators, there could

be "language barriers in terms of accent" which might make it more difficult for his constituents to relate to them.

**6.** The State argues that *Limit, supra,* is distinguishable from the case *sub judice* because the State of Washington has a 3% black population whereas Mississippi has a 36% black population. This is obviously not a valid basis for distinction.

The State also contends that *Limit* is distinguishable because the Washington statutes provided only six months for signature gathering whereas Mississippi's provides twelve months, and because Mississippi permits initiative peti-

that paid-per-signature circulators will act "unscrupulously" is just that: speculation.

 Like Senator Jordan, Representative Green testified generally that she had received information from constituents that they had signed petitions for term limits, the import and/or reach of which had been misrepresented to them. Representative Green, however, did not assert that these complaints concerned nonresident and/or paid-per-signature circulators.[7] Representative Green did relate a personal experience in which the reach of the term limits initiative being presented was misrepresented to her by a nonresident signature gatherer who, upon her inquiry, told her that he was receiving $1.00 for each signature he obtained. It is manifest, though, that one individual's experience with fraud by one nonresident paid-per-signature petition circulator on one occasion hardly provides a sufficient basis from which one could reasonably infer that nonresident petition circulators have a greater tendency than resident volunteer or paid-by-the-hour or by-the-day circulators to commit fraud or that such nonresident and/or paid-per-signature circulators otherwise pose a threat to the integrity of the initiative process.[8]

Neither Senator Jordan's nor Representative Green's testimony tends to prove what the State must prove, namely, actual fraud or threat to citizens' confidence in government posed by out-of-state circulators and/or circulators who are paid per signature. *Meyer* made clear that Colorado's burden was to show that paid petition circulators were actually more likely to commit fraud. It follows that the State's burden in the case at bar is to show that circulators who are paid per signature are more likely to commit fraud. This same reasoning would extend to nonresident circulators. There is, however, simply no proof to support such a finding.

Moreover, the court fails to perceive the logic in the reasoning by which the State concludes that persons who are disinterested in whether an initiative makes it to the ballot are more likely to offer false and misleading information to induce signatures than persons who are zealously interested in the success of an initiative petition drive. Moreover, contrary to the State's urging, it is not necessarily or even likely the case that "Mississippi citizens are more likely to be more knowledgeable [than disinterested nonresident circulators] concerning the details of petition contents and better equipped to furnish adequate information" to their fellow citizens about an initiative. And the State has offered no evidentiary support for such a conclusion.

Based on the foregoing, the court concludes that plaintiffs' motion for summary judgment should be granted. It is therefore unnecessary for the court to address the motion for preliminary injunction.

Accordingly, it is ordered that plaintiffs' motion for summary judgment is granted. It is further ordered that all remaining motions in this case are denied as moot.

---

tions only for constitutional amendments whereas Washington allows them for statutes. This position, too, is patently without merit.

**7.** Senator Jordan did say that he was told by his constituents that their problems had been with nonresident circulators, and he stated further that he was told during the debate on the legisla-

tion at issue that the problems had been caused by nonresidents who were paid per signature. This clearly constitutes hearsay, and thus does not go toward sustaining the State's burden.

**8.** The State also offered testimony of Susan Martindale. She had nothing of relevance to say.