# United States Court of Appeals

### For the Eighth Circuit

_____

No. 15-3400

_____

Mike MacMann; Betty Wilson

*Plaintiffs - Appellants*

v.

Mike Matthes; City of Columbia, Missouri

*Defendants - Appellees*

Opus Development Company, L.L.C.; HSRE ODC II MIZZOU, LLC

*Intervenors*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: September 21, 2016
Filed: December 9, 2016

_____

Before WOLLMAN, ARNOLD, and KELLY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Mike MacMann and Betty Wilson (collectively, the residents) sued the City of Columbia, Missouri, and City Manager Mike Matthes (collectively, the City),

alleging that the City violated their rights under the Columbia City Charter, the Missouri Constitution, and the First and Fourteenth Amendments to the U.S. Constitution by interfering with their participation in a municipal referendum process to repeal two ordinances passed by the City Council in connection with a student-housing development project proposed by Opus Development Company. The district court[1] rejected the residents' arguments and granted summary judgment to the City.[2] The residents appeal, and we affirm.

On March 19, 2014, the City Council approved an ordinance authorizing the City Manager to enter into a development agreement with Opus to construct a student-housing project in downtown Columbia (Ordinance A). The agreement noted that existing public-utility infrastructure was inadequate to serve the Opus project as proposed; that Opus would contribute $450,000 for infrastructure improvements in the area; and that the City would approve construction of the project, assuming "all requisite permits have been issued by the City." Within a week after the development agreement was signed, opponents of the project, including the residents, initiated the referendum process under the City Charter and began to obtain signatures on a referendum petition to repeal Ordinance A (Referendum A). On March 31, while the Referendum A process was ongoing, the City Manager signed the Opus development agreement authorized by Ordinance A. As required under the City Charter,

---

[1] The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

[2] The district court granted Opus Development Company, LLC, the project developer, and HSRE ODC II MIZZOU, LLC, the owner of the subject real property, permission to intervene for the limited purpose of opposing the residents' request to extend a temporary restraining order (TRO) entered by a state-court judge before the City removed the case to federal court. The district court treated the residents' request to extend the TRO as a motion for a preliminary injunction, denied the motion, and thereby dissolved the TRO.

Referendum A was submitted to the City Clerk on April 8 for certification that the required number of valid signatures had been obtained in support of the referendum.

On May 19, after Referendum A had been filed with the City Clerk, but before it had been certified, the City Council approved Ordinance B, which the district court found "was in all material ways the same as Ordinance A, the subject of the ongoing referendum process," except that Ordinance B contained a contingency, which stated that if no referendum petition was filed to repeal Ordinance B, then Ordinance A would be automatically repealed. When Ordinance B was approved by the City Council, Ordinance A was still in effect. Opponents of the Opus project, including the residents, immediately began gathering signatures on a second referendum petition to repeal Ordinance B (Referendum B).

The City Clerk certified the signatures on Referendum A on May 29. Pursuant to the City Charter, "further action []under" Ordinance A was "suspended" after certification of Referendum A. The Charter required the City Council to reconsider Ordinance A within thirty days and determine whether it should be repealed. Only if the City Council declined to repeal Ordinance A after reconsideration was the Council required under the Charter to submit the matter to City voters for a determination whether to repeal Ordinance A. On June 16, within the designated thirty-day period, the City Council reconsidered and repealed Ordinance A. At that time, Ordinance B was in effect, although Referendum B had been submitted to the City Clerk on June 9 for certification.

On July 7, while certification of the Referendum B signatures was still pending with the City Clerk, the City Council adopted a resolution authorizing temporary sidewalk and parking-lane closures around the Opus development site.[3] The City also

---

[3]Unlike ordinances, neither resolutions adopted by the City Council nor permits issued by the City administrative departments are subject to the citizen-referendum

began to issue permits for the Opus project under its administrative authority, including land-disturbance, demolition, footings-and-foundation, and building permits. According to the City, the various municipal departments issued these permits because updated building specifics submitted by Opus and infrastructure-improvement plans devised by the City established that the affected infrastructure could now accommodate the Opus project.

In the meantime, the City Clerk certified the signatures on Referendum B on July 31. As it did with Ordinance A, the City Council reconsidered Ordinance B and on August 18, repealed the ordinance without submitting the matter to City voters. The City never signed the development agreement with Opus that had been authorized by Ordinance B.

On August 12, the residents filed suit in Missouri state court, alleging that the City had engaged in a "plan and scheme to deny [the residents] their rights under the City Charter and [had] thus violated their rights to free speech, to petition the government, all as protected by the First and Fourteenth Amendments." They contended that once they initiated the referendum process under the City Charter to challenge Ordinance A, the City could not constitutionally interfere with that ongoing process, either by introducing Ordinance B—an ordinance that was materially identical to the ordinance they were seeking to repeal—or by authorizing permits for the Opus development project—the subject of the ongoing referendum process. The residents also argued that Ordinance B was an unconstitutional effort by the City Council to coerce the residents into giving up their right to participate in the referendum process by conditioning the repeal of Ordinance A on the residents' capitulation to the adoption of Ordinance B. The City removed the case to federal

---

provisions set forth in the City Charter.

-4-

court on August 21, asserting federal-question jurisdiction under 28 U.S.C. § 1331, and the residents did not seek to remand the case to state court.[4]

The district court eventually granted the City's motion for summary judgment. It concluded that the residents' rights to participate in the referendum process were not unlimited but were defined and circumscribed by the City Charter, that the City complied with all the provisions set forth in the City Charter, that the residents received all the process they were due under Missouri law and the City Charter, that the residents had not identified a First Amendment violation, and that the challenged contingency set forth in Ordinance B was not an unconstitutional condition because it did not extract a *quid pro quo* for citizen participation in the referendum process. The residents challenge each of these conclusions on appeal.[5]

"We review the grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences" in that party's favor. Putman v. Unity Health Sys., 348 F.3d 732, 733 (8th Cir. 2003). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

_____

[4]In September 2014, after this case was removed, the residents filed a separate action in state court, seeking a declaration that the City's issuance of permits for the Opus development project was arbitrary and capricious because the referendum process was ongoing and because the relevant utility infrastructure was insufficient. After the state-court judge dismissed some of the residents' claims, they voluntarily dismissed their remaining claims.

[5]The City argues that the residents lack standing because they have not alleged a particularized injury in fact or that any such injury could be redressed by the court. We disagree, because the residents have twice initiated and participated in the municipal referendum process and have asserted claims for relief that could be redressed by this court.

to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

The residents first argue that the City's interference with their right to participate in the referendum process violated both the City Charter itself and the Missouri Constitution. They argue that the municipal referendum rights set forth in the Charter must be considered in light of the rights conferred upon Missouri residents under the state constitution. We agree that the City Charter must be consistent with the Missouri Constitution and state law, State *ex rel.* Petti v. Goodwin-Raftery, 190 S.W.3d 501, 505 (Mo. Ct. App. 2006), but the residents do not argue that the Charter itself is inconsistent with the Missouri Constitution or state law. Rather, they argue that under the Missouri Constitution, their Charter-granted referendum rights are entitled to "expansive treatment" and are "not limited," and that the district court improperly circumscribed the scope of those rights. We disagree.

It is true that the Missouri Constitution confers upon Missouri citizens the right to challenge by referendum laws enacted by the state legislature. See Mo. Const. art. III § 49 (stating that "[t]he people reserve power to propose and enact . . . laws and amendments to the constitution by the initiative, independent of the general assembly"). But the Missouri Constitution also provides that, for a city with a charter form of government, the city charter confers the right, if any, to challenge by referendum laws enacted by a city council. Id. art. VI § 19(a) (noting that a city with a charter form of government "shall have all powers" that the Missouri general assembly "has authority to confer . . . , provided such powers are consistent with the constitution of this state and are not limited or denied either by the charter . . . or by statute"). Municipal charters are adopted by a vote of the citizens of a municipality, id., and thus, "[t]he authority granted to municipalities by the Missouri Constitution to adopt and amend a charter reflects a city's 'broad authority to tailor a form of government that its citizens believe will best serve their interest[s],'" Petti, 190 S.W.3d at 505 (quoting City of Springfield v. Goff, 918 S.W.2d 786, 789 (Mo.

-6-

1996)). The Missouri courts have recognized that when a city is governed by a charter, the charter defines and limits city residents' rights to challenge by referendum municipal ordinances adopted by the city. See State *ex rel.* Chastain v. City of Kansas City, Mo., 289 S.W.3d 759, 764 (Mo. Ct. App. 2009) ("Municipal charters are a charter city's organic law, its constitution."); see also Petti, 190 S.W.3d at 505 (noting that although the Missouri Constitution "sets forth the power reserved to the people of Missouri to . . . approve or reject by referendum acts of the general assembly, the powers reserved to the people of [the city of] Florissant with respect to use of the initiative and referendum processes are defined and limited by the city charter"); Murray v. City of St. Louis, 947 S.W.2d 74, 80 (Mo. Ct. App. 1997) ("[T]he power of referendum reserved to the people of the City with respect to ordinances is that which is contained in the City Charter. It is not subject to or restricted by the state constitutional power of referendum which applies to state statutes.").

In State *ex rel.* Powers v. Donohue, the county residents argued that the Missouri Constitution created an initiative right to submit county zoning ordinances to a vote of the people and that the denial of such right would "deprive them of any political-action remedy against outright confiscation." 368 S.W.2d 432, 437 (Mo. 1963). The Missouri Supreme Court rejected the argument, noting first that the Missouri Constitution conferred upon state residents the power "to propose and enact or reject laws and amendments to the constitution by initiative and to approve or reject by referendum acts of the general assembly." Id. at 434. The Court then distinguished these rights from the initiative rights granted to the county residents to challenge county ordinances, concluding that "[t]he powers reserved to the people of [the county] with respect to use of the initiative and referendum are defined and limited by [the county] charter." Id.; see also State *ex rel.* Harry L. Hussman Refrigerator & Supply Co. v. City of St. Louis, 5 S.W.2d 1080, 1087 (Mo. 1928) (holding that the Missouri Constitution reserves the power of referendum only to acts of the state legislative assembly and not to acts of a municipality). Because the

-7-

county charter did not permit residents to propose by initiative petition an amendment to a zoning ordinance, the court rejected the argument. Id. at 438-39. This reasoning was followed more recently by the Missouri Court of Appeals in Petti, which involved the city council's approval of a zoning ordinance to allow a shopping-center development project, followed by the citizens' initiation of a referendum process to have the ordinance repealed. 190 S.W.3d at 504-05. The city clerk rejected the referendum petition because the city charter excluded zoning ordinances from the referendum process. Citing Powers, the court noted that the rights reserved to city residents to challenge municipal ordinances by initiative and referendum processes are not granted by the Missouri Constitution, but by the city charter, which excluded zoning ordinances from the referendum process. Because the exclusion was not unlawful, the city clerk could not be compelled to accept and process the referendum. Id. at 505-06.

As they did before the district court, the residents suggest that Powers and Petti are inapposite because they involved zoning ordinances. They point instead to the Missouri Supreme Court's decision in Earth Island Institute v. Union Electric Co., 456 S.W.3d 27 (Mo. 2015), in which the court considered whether the Missouri state legislature could enact a statute effectively preempting a statute proposed by an initiative petition that had been approved for, but not yet submitted to, a vote of the people. Id. at 29-30. The court held that if the legislature's statute were "permitted to preemptively modify the initiative . . . , it would allow the legislature to undercut or undo a law initiated by the people before it could ever be voted on," effectively negating in advance the will of the people. Id. at 34; see also State *ex rel.* Drain v. Becker, 240 S.W. 229, 232 (Mo. 1922) (noting that once a statute is adopted by initiative or referendum, the legislature is free to amend or repeal it as it would any other statute, but it may not preempt the effect of a later-adopted referendum or initiative while it is still pending before the voters by enacting legislation inconsistent with the measure during that interim period).

Earth Island is of no aid to the residents, however, because it specifically addresses referendum rights granted to Missouri citizens by the Missouri Constitution with respect to laws enacted by the state legislature, and does not analyze referendum rights granted to city residents by a city charter with respect to municipal ordinances enacted by a city council. Although Powers and Petti involved zoning ordinances, the underlying reasoning of those cases, along with Goff, Chastain, and Murray is persuasive since each of those cases involved action under a city or county charter. We thus conclude that the district court properly analyzed the residents' referendum rights as they are defined under the City Charter. See Chastain, 289 S.W.3d at 764-65 ("While . . . the Missouri Constitution sets forth the power reserved to the people of Missouri to propose and enact *state laws* by initiative, the powers reserved to a municipality with respect to enacting *municipal ordinances* by initiative are defined and limited by the charter."); see also Murray, 947 S.W.2d at 78 ("Voters of a municipality have no inherent right to referendum on municipal legislation; they have only such right to referendum as conferred by statute or charter.").

We turn then to the referendum rights granted to the residents under the City Charter and whether the City violated those rights. The residents argue that once the referendum process had been initiated in response to Ordinance A, the City Council was prohibited by the City Charter from taking any further action with respect to the subject matter of that ordinance, *i.e.*, the Opus development project. The City Charter grants voters the "power to approve or reject at the polls any ordinance passed by the council, . . . such power being known as the referendum." It further states:

> When a referendum petition has been certified as sufficient, the ordinance specified in the petition shall not become effective, or, if it shall have gone into effect, further action thereunder shall be suspended until the ordinance referred has been approved by the voters as hereinafter provided. The council shall proceed forthwith to reconsider the referred ordinance, and its final vote upon such reconsideration shall be taken within thirty (30) days after certification and shall be upon the

-9-

question: "Shall the ordinance specified in the referendum petition be repealed?"

If the council shall fail to repeal an ordinance specified in any referendum petition, such repeal ordinance shall be submitted without alteration to the voters of the city at the next election . . . .

These sections establish and restrict the residents' referendum rights—as well as the alternatives available to the City Council in responding to a certified referendum petition. The Charter requires suspension of "further action []under" an ordinance subject to a referendum petition only after the referendum petition has been certified by the City Clerk. When the City Council adopted Ordinance B, Referendum A had not yet been certified, and the City Charter did not require that further action under Ordinance A be suspended until Referendum A had been certified. Thus, to the extent that Ordinance B could be considered "further action []under" Ordinance A, the City Council did not violate the City Charter or interfere with the residents' referendum rights thereunder by adopting Ordinance B. Once Referendum A was certified, the City Council was authorized to, and did in fact, repeal Ordinance A rather than submitting it to a vote of the people. And once Referendum B was certified, the City Council also reconsidered and repealed Ordinance B. In other words, the residents exercised the referendum rights they were granted under the City Charter, and they achieved the results they sought by initiating the process: Ordinance A and Ordinance B were both repealed. The City did not violate the residents' rights by enacting Ordinance B while Referendum A was pending.

The residents also argue that the City interfered with their referendum rights by issuing construction-related permits for the Opus project while the referendum process was ongoing. This argument fails, however, because the City Charter does not grant the residents any right to challenge the issuance of permits by City administrative departments. Indeed, as noted by the district court, "[t]here is nothing in the City Charter that permits a referendum to repeal a building permit granted by

-10-

the City." The City Charter grants voters the power to approve or reject by referendum "any ordinance passed by the council," and permits, including the construction-related permits that the residents seek to challenge here, are not issued by ordinance. Moreover, although the City Charter dictates that "further action []under" a referred ordinance must be suspended once a referendum petition is certified, the issuance of permits for the Opus project was not "further action []under" either Ordinance A or Ordinance B. Instead, the issuance of permits was a "ministerial act" that the City was obligated to perform once Opus submitted valid permit applications. A city official "may not legally refuse to perform" a ministerial act that the "law directs the official to perform upon a given set of facts . . . if the requirements of the governing city ordinances are met." State *ex rel.* Kessler v. Shay, 820 S.W.2d 311, 314 (Mo. Ct. App. 1991). There is nothing in the record indicating that the City issued permits for the Opus project for any reason other than as part of its ministerial duties once Opus submitted valid permit applications.[6] The issuance of permits for the Opus project did not violate the residents' Charter-granted referendum rights, and they have identified no independent right to challenge the issuance of those permits. Accordingly, the district court did not err in granting summary judgment to the City on the residents' claims involving the issuance of the Opus project permits.

The residents also contend that the City's interference with the referendum process violated their rights under the First and Fourteenth Amendments to the U.S. Constitution. In Dobrovolny v. Moore, 126 F.3d 1111, 1112-13 (8th Cir. 1997), we rejected similar First and Fourteenth Amendment challenges to the initiative process authorized by the Nebraska Constitution, under which the requisite number of

---

[6]As recognized by the district court, because residents of Columbia cannot challenge by referendum the ministerial actions taken by the City or its various administrative departments, including the issuance of construction-related permits, the adequacy of the City's downtown infrastructure to support the Opus project is irrelevant to the residents' claims.

signatures needed to place an initiative measure on the ballot could not be calculated with certainty until the date on which the initiative petition was submitted to the secretary of state for certification. With respect to the First Amendment claim, we held that the reasoning in Meyer v. Grant, 486 U.S. 414, 420-22 (1988), in which the Court invalidated on First Amendment grounds a Colorado statute criminalizing the payment of initiative-petition circulators, did not control, because Nebraska's initiative process, unlike the Colorado process at issue in Meyer, did not interfere with the message communicated by proponents in the initiative petition, did not restrict proponents' ability to circulate the petition, did not affect proponents' ability to communicate with other voters, and did not regulate the content of proponents' speech. Dobrovolny, 126 F.3d at 1112-13. We determined that in the absence of some showing that the challenged initiative process substantially restricted political discourse, the Supreme Court's holding in Meyer did not control. Id.

In Missouri Roundtable for Life v. Carnahan, we relied on Dobrovolny to conclude that a Missouri law requiring state officials to prepare summaries of proposed ballot initiatives did not violate a political organization's First Amendment rights, because the law did not limit the number of circulators permitted to solicit signatures on the initiative petition, nor did it restrict the circulators' or the organization's speech, regulate how circulators gathered signatures on the initiative petition, or prevent the organization from preparing its own ballot-initiative summary. 676 F.3d 665, 675-77 (8th Cir. 2012); see also Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1101 (10th Cir. 2006) (rejecting a First Amendment challenge by animal-advocacy groups to a Utah constitutional provision requiring a supermajority for wildlife-related initiatives and noting that "[t]he First Amendment ensures that all points of view may be heard; it does not ensure that all points of view are equally likely to prevail"); Biddulph v. Mortham, 89 F.3d 1491, 1500 (11th Cir. 1996) ("Most restrictions a state might impose on its initiative process would not implicate First Amendment concerns.").

The residents have not shown any restriction on their ability to participate in the referendum process or otherwise engage in political speech, nor have they shown any burden on their ability to publicize their views. Neither the referendum process itself nor the City's conduct in responding to the referendum process interfered in any way with the message the residents sought to communicate, restricted their ability to circulate either referendum petition, regulated the content of their speech, or infringed on their ability to communicate with other voters or the manner by which they could so communicate. We thus affirm the district court's conclusion that the residents have not established a violation of their First Amendment rights.

We also reject the residents' claim that the City violated their rights under the Fourteenth Amendment by depriving them of protected liberty and property interests without due process of law. See Mo. Roundtable, 676 F.3d at 677. They assert that they had "legitimate, protectable property and liberty interests in the referendum petitions that they delivered to the City of Columbia" and that the City infringed upon those rights. The existence of a "protected . . . interest is a condition precedent to the government's obligation to provide due process of law, and where no such interest exists, there can be no due process violation." Dobrovolny, 126 F.3d at 1113. In Dobrovolny, the plaintiffs raised similar due-process arguments, contending that they had a property interest in the initiative process in light of their investment of time, money, and effort in that process and that they had a liberty interest in the initiative process that encompassed the right to know in advance the specific number of signatures needed for certification of an initiative petition. Id. We rejected these arguments, concluding that "[c]learly, the right to a state initiative process is not guaranteed by the U.S. constitution but is instead created by state law," as were the procedures surrounding the initiative process. Id. (noting that "[t]he state retains the authority to interpret [the] scope and availability of any state-conferred right or interest" and any "interest created by state law is by definition circumscribed by the law creating it" (citations omitted)). We reasoned that if any right to the initiative process itself or to a particular procedure thereunder existed, it was "dependent upon

-13-

a finding that state law . . . created . . . an interest substantial enough to rise to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." Id. (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)). Just as the appellants in Dobrovolny had no constitutionally protected right to place issues before the Nebraska voters, the residents here have no constitutionally protected right in the referendum process. Any opportunity to participate in the municipal referendum process is subject to the procedures set forth in the City Charter, "the [C]ity's organic law, its constitution." Chastain, 289 S.W.3d at 764.

Even assuming that those interests were guaranteed by the U.S. Constitution, the residents received all the process they were due. The City complied with the provisions set forth in the Charter, including the requirement that the Council reconsider the referred ordinances. The residents were able to successfully pursue the referendum process to achieve their goals to repeal both Ordinance A and Ordinance B. The district court thus did not err in granting summary judgment to the City on this issue.

Finally, the residents argue that Ordinance B included an unconstitutional condition, *i.e.*, a provision that conditioned a benefit—the repeal of Ordinance A—upon the abandonment of constitutionally protected conduct—the initiation of a referendum petition to repeal Ordinance B—in violation of the First Amendment. Section 3 of Ordinance B provided that "[i]n the event a referendum petition is not filed" under the City Charter "requesting a repeal of this ordinance . . . , [Ordinance A] shall be repealed in its entirety." As previously discussed, there is no constitutional right at stake in the referendum process, and thus conditioning the repeal of Ordinance A on abstaining from the referendum process cannot be unconstitutional.

-14-

The City complied with all relevant provisions set forth in the City Charter. The residents fully engaged in the referendum process to repeal Ordinances A and B, both of which were, in fact, repealed by the City Council. The residents' participation in the referendum process was thus successful and was not inhibited in any way by the City. The judgment is affirmed.

_____